*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
ELECTRONIC CITATION: 2000 FED App. 0135P (6th Cir.)
File Name: 00a0135p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---



JACK M. BASS, JR.,
     *Plaintiff-Appellant/*
     *Cross-Appellee,*

     *v.*

JANNEY MONTGOMERY
SCOTT, INC.; GARRY A. FULD,
     *Defendants-Appellees/*
     *Cross-Appellants,*

TECHNIGEN CORPORATION;
JOYTEC, LTD.; LAWRENCE A.
NESIS,
     *Defendants,*

JOHN GRAY; NORMAN T.
WILDE, JR.,
     *Defendants-Appellees.*

Nos. 98-6150/6226

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 91-00097—Robert L. Echols, Chief District Judge.

Argued: September 14, 1999

Decided and Filed:  April 17, 2000

Before:  GUY, RYAN, and MOORE, Circuit Judges.

————————————

**COUNSEL**

**ARGUED:** Daniel Wallace Small, Nashville, Tennessee, for Appellant.  Ames Davis, WALLER, LANSDEN, DORTCH & DAVIS, Nashville, Tennessee, for Appellees. **ON BRIEF:** Daniel Wallace Small, Nashville, Tennessee, Jeffrey Alan Greene, CASTLEMAN & GREENE, Goodlettsville, Tennessee, for Appellant.   Ames Davis, Kathryn S. Crenshaw, James W. White, WALLER, LANSDEN, DORTCH & DAVIS, Nashville, Tennessee, for Appellees.

   RYAN, J., delivered the opinion of the court, in which GUY, J., joined.   MOORE, J. (pp. 26-31), delivered a separate opinion concurring in the judgment.

————————————

**OPINION**

————————————

   RYAN, Circuit Judge.  Foremost among the issues we must decide in this appeal is whether the inclusion of stock purchase warrants along with a promissory note given in consideration of a loan renders the transaction subject to federal and Tennessee securities laws.  We hold that it does, and because the district court ruled to the contrary, we reverse, in part, the judgment for the defendants.

   The case came to litigation because the plaintiff, Jack M. Bass, Jr. , made two loans totaling $600,000 to a company called Technigen Corporation, and Technigen defaulted on repayment.   The loans were intended to serve as "bridge loans" to help Technigen meet its operations costs in the period leading up to the issuance of Technigen securities in a

the plan of distribution in part signals that the notes might not be securities, but that factor by itself is not dispositive."); *Trust Co. of Louisiana v. NNP Inc.*, 104 F.3d 1478, 1489 (5th Cir. 1997) ("A debt instrument may be distributed to but one investor, yet still be a security.").  The fact that Bass and Technigen entered into the transaction for investment reasons combined with the fact that there are no risk-reducing factors other than federal and Tennessee securities laws weigh in favor of the notes being securities.  Because the defendants have failed to rebut the presumption that the notes are securities, I would hold that the district court erred when it concluded that the promissory notes at issue in this case do not qualify as securities for the purpose of federal and Tennessee securities laws.

[1933 and 1934] Acts were held not to apply." *Id.* The magistrate judge in the present case, apparently focusing on the Supreme Court's statement that the notes in *Reves* were uncollateralized, concluded that the fourth factor weighed against a finding that the notes were securities because "[i]n the present case plaintiff sought to obtain, and did obtain, certain collateral in order to reduce his exposure to loss." J.A. at 474 (Magistrate Judge's R & R at 22).

Several circuit courts, however, have not focused on whether the loans were secured or collateralized when considering the fourth factor; instead, they have interpreted the Supreme Court's analysis of the fourth factor in *Reves* to emphasize whether there is a risk-reducing factor such as another regulatory scheme that reduces the risk of the investment. *Stoiber,* 161 F.3d at 751 ("The fourth and final inquiry looks to the adequacy of regulatory schemes other than the federal Securities Acts in reducing risk to the lender."); *Wright v. Downs*, 1992 WL 168104, *3 (6th Cir. July 17, 1992) (unpublished) ("[T]he fourth factor is whether some regulatory scheme exists to reduce the risk of the investment."); *see also Pollack*, 27 F.3d at 814-15. In this case, the defendants have provided no evidence to show that there is another regulatory scheme available to reduce the risk of Bass's investment other than federal and state securities laws. Furthermore, the lien that Bass received as collateral was insufficient to reduce significantly the risk of his investment. Thus, the fourth factor weighs in favor of the notes being securities in this case.

The defendants have failed to rebut the presumption of the "family resemblance" test, which initially considers all notes to be securities, because the notes in this case do not resemble any of the non-securities enumerated in *Reves* and an examination of the four factors does not indicate that the notes should be added to the list of non-securities. Although the second factor — the method of distribution — weighs against the notes being considered securities, this factor alone is not dispositive. *See Stoiber*, 161 F.3d at 752 ("Admittedly

private placement. The defendant, Janney Montgomery Scott, Inc., was the lead underwriter of the private placement; it was also Janney that solicited the participation of Bass in the loan transaction. When the private placement failed, Technigen was unable to repay the loans, and Bass brought suit against both Technigen and Janney for federal and Tennessee securities fraud, for other federal and Tennessee securities law violations, and for common law fraud. Bass subsequently settled with Technigen, but the suit against Janney went to trial.

At trial, the district court granted Janney's motion for summary judgment with regard to the securities law claims, on the ground that the bridge loans were not securities. The jury found Janney liable for negligent misrepresentation only, and awarded Bass damages of $350,000. Because the jury found Bass contributorily negligent, the award was reduced to $192,500 under Tennessee's comparative fault rule. Both sides appeal.

We conclude that because the consideration given in exchange for the bridge loans included warrants for the purchase of Technigen common stock, the federal and state securities laws were invoked as a matter of law. We therefore reverse the dismissal of Bass's state and federal securities fraud claims and in all other respects affirm the judgment of the district court.

## I.

Bass is a sophisticated investor, having worked since 1955 as an investment broker and analyst, and having served on the National Association of Securities Dealers' disciplinary committee.

Bass's first dealings with the Janney defendants were in 1988 in a matter unrelated to this case, when Bass agreed to provide a bridge loan to a company called Cardinal Technologies. Janney was the underwriter for the subsequent financing whose proceeds would, in part, be used to repay the

bridge loan. This transaction was successfully completed to the satisfaction of all parties, and as a result, Bass indicated to Janney that he would be receptive to any offers to repeat the experience.

In December 1989, Janney approached Bass to learn whether he would be interested in providing a bridge loan in a transaction substantially similar to that with Cardinal Technologies. The borrower this time would be a Canadian company called Technigen Corporation; this was the first time Bass had heard of Technigen. Technigen had at one time been involved in oil and mineral operations, but since its 1986 acquisition of Joytec, Ltd., a company involved in the development and manufacture of indoor computerized golf simulators, had been primarily concerned with the manufacture and development of Joytec's golf simulator technology.

Through one of Bass's brokers, Janney sent Bass a packet of information about Technigen/Joytec and their simulator, as well as documents outlining the securities offering for which the proposed loan was to be made, and Janney's internal projections concerning Technigen's prospects. Technigen was seeking $3-$5 million from the offering to get Joytec's simulator into production, and needed approximately $500,000 to fund its operations until the offering was complete. Bass agreed to provide the loan.

The initial loan, closed February 6, 1990, was in the amount of $500,000, in return for which Bass received a promissory note in a like amount, bearing an interest rate of 12%, and having a one-year term. If the private placement closed successfully before the end of the one-year term, the note would become due upon that closing. Joytec guaranteed the loan, and it was additionally secured by a lien on virtually all assets of Technigen and Joytec. Bass also received a purchase warrant for Technigen common stock exercisable for 250,000 to 750,000 shares. Finally, Bass received a hypothecation and

The third factor addresses the reasonable expectations of the investing public. The magistrate judge concluded that "[t]his factor is not particularly helpful because there was no investing public in this case, there was only plaintiff." J.A. at 473-74 (Magistrate Judge's R & R at 21-22). The third *Reves* factor, however, is an objective test that turns on whether a reasonable purchaser would have perceived the notes to be an investment. *Reves,* 494 U.S. at 68-69. It therefore makes little difference that there was only one investor in this case because the fact that the notes were offered only to Bass does not affect the objective expectations of a reasonable purchaser in his position.

I believe that a reasonable purchaser in Bass's position would have considered the notes to be securities. First, the sellers in this case explicitly designated the notes as securities. J.A. at 116 (Mem. of Financing Terms). As the District of Columbia Circuit explained, "When a note seller calls a note an investment, in the absence of contrary indications 'it would be reasonable for a prospective purchaser to take the [offeror] at its word.'" *Stoiber v. Securities and Exchange Commission*, 161 F.3d 745, 751 (D.C. Cir. 1998) (quoting *Reves*, 494 U.S. at 69) (alteration in original), *cert. denied*, --- U.S. ---, 119 S. Ct. 1464 (1999). Moreover, Bass has testified that the defendants referred to the notes as securities when they contacted him about the investment. Thus, the evidence, when considered in the light most favorable to Bass, demonstrates that a reasonable purchaser would have considered the notes to be investments given the circumstances in this case.

The fourth factor assesses whether there is some risk-reducing factor that suggests that the instruments were not in fact securities. *Reves*, 494 U.S. at 69-70. When analyzing the fourth factor in *Reves*, the Supreme Court mentioned that the notes in that case were "uncollateralized and uninsured." *Id.* at 69. The Court then went on to conclude that the fourth factor weighed in favor of the notes being securities because the notes "would escape federal regulation entirely if the

securities. Thus, the only question at issue in this case is whether the promissory notes should be added as a new category of non-securities — a question that turns solely on the four factors articulated in *Reves*.

Unlike the majority, I believe that the first *Reves* factor — the motivations that would prompt reasonable parties to enter into the transaction — weighs in favor of the notes being securities. The Supreme Court explained in *Reves* that the first factor suggested that the notes were securities because "[the issuer] sold the notes in an effort to raise capital for its general business operations, and purchasers bought them in order to earn a profit in the form of interest." *Id.* at 67-68 (footnote omitted); *see also Pollack v. Laidlaw Holdings, Inc.,* 27 F.3d 808, 812 (2nd Cir.) ("The inquiry is whether the motivations are investment (suggesting a security) or commercial or consumer (suggesting a non-security).instance"), *cert. denied*, 513 U.S. 963 (1994). Like the parties in *Reves*, both of the parties in this case were motivated by investment considerations: Technigen issued the notes to obtain capital for its general business and manufacturing operations, and Bass purchased the notes because he hoped to earn a profit in the form of interest on the notes. Joint Appendix ("J.A.") at 951-52 (Bass Test.).

The second factor requires an examination of the plan of distribution for the notes. If the notes are offered and sold to a broad segment of the public or if the notes are instruments that are commonly traded for speculation or investment, then this factor suggests that the notes are securities. *Reves*, 494 U.S. at 66. In the present case, this factor weighs against the notes qualifying as securities. Bass acknowledges that "unlike in the *Reves* case, the particular note [that he received] was not itself widely issued." Bass's Reply Br. at 7. Indeed, as the magistrate judge explained, "The only solicitation connected with the note was directed toward plaintiff and was done in a limited and private manner." J.A. at 473 (Magistrate Judge's Report and Recommendation ("R & R") at 21).

pledge of all Joytec shares held by Technigen, and assignment of a debenture held by Technigen.

Three months later, Bass provided a second bridge loan to Technigen in the amount of $100,000. The second loan was to come due on the same date as the first, and the promissory note was amended to include the second loan in its principal amount. The guarantee, hypothecation and pledge of shares, and debenture assignment were all also extended to the second loan, and the warrant was amended to cover the purchase of 362,500 to 1,087,500 shares of Technigen common stock. In addition, Bass received a hypothecation and pledge of 200,000 shares of Technigen common stock owned by its president.

In May 1990, Janney commenced the private placement of Technigen securities as promised, but in June was forced to withdraw the offering due to insufficient subscription. As a result, Technigen was unable to repay the bridge loans.

Immediately before and during the period of the two bridge loans, Technigen and its president, Lawrence A. Nesis, had been receiving considerable bad press as well as unwanted attention from Canadian government regulators. Specifically, Nesis had been accused of issuing misleading press releases for the purpose of manipulating Technigen's stock price. In these press releases, Nesis claimed that Joytec's simulator was enjoying huge success in Japan and North America, with large orders pouring in from reputable companies, including Sony. These claims were false. As a result, Technigen and Nesis were investigated by the British Columbia Securities Commission (BCSC). Ultimately, Nesis and the BCSC entered into a consent decree whereby Nesis agreed that the press releases were misleading and that he would not act as an officer or director of any company whose shares were listed on the Vancouver Stock Exchange. Shortly before the consent decree was entered, Technigen delisted on the Vancouver Stock Exchange; it continued trading on the NASDAQ, where it had been listed for almost two years.

At the time he agreed to make the first bridge loan to Technigen, Bass knew about both the BCSC investigation and the delisting from the Vancouver Stock Exchange. However, Technigen characterized the investigation as a misunderstanding, and the delisting as an effort to avoid stigma by leaving an exchange reputed to be riddled with corruption. Apparently, both Bass and Janney accepted Technigen's characterization at face value.

As underwriter of the private placement of securities for which the Bass loans were bridge financings, Janney was required to perform a "due diligence" investigation of Technigen. However, Janney's performance does not appear to have been markedly diligent; although its Lexis-Nexis search for news articles mentioning Technigen turned up a number of hits, no one at Janney reviewed the uncovered articles until well after the commitment to underwrite the offering was firm. Indeed, although the titles to the articles were compiled into a list, it is not clear that even the titles were reviewed for content. According to the trial testimony of one of Janney's officers, had any of the more provocatively entitled articles ("Scam Capital of the World," "A Strange Way to Run a Company") been brought to the attention of a responsible decision-maker at Janney, Janney would not have agreed to underwrite the offering.

In March 1990, Janney first received information that Technigen's president, Nesis, had entered into the November 20, 1989, consent decree with the BCSC. As part of a memorandum sent in the regular course of business in April or May of 1990, Janney forwarded the information to Bass. In hindsight, this method of disclosure appears lax, but may, as the defendants suggest, have been in keeping with the fact that, at the time, Janney did not consider the information to be a deal-breaker for itself, and therefore not likely to be for Bass.

The Technigen offering failed in June 1990, and, as we have said, Technigen defaulted on the loans. Soon thereafter,

The Supreme Court has adopted the "family resemblance" test for determining whether certain promissory notes qualify as securities. *Reves*, 494 U.S. at 63-66. In *Reves*, the Court was careful to point out that, according to the family resemblance test, every note is initially presumed to qualify as a security. *Id.* at 65-67. Indeed, this presumption that all notes are securities can only be overcome in one of two ways: the notes must bear a strong resemblance, in terms of the four factors considered in the *Reves* decision, to one of the judicially created categories of notes that do not qualify as securities,[2] or the notes must have characteristics that, after considering the four *Reves* factors, weigh in favor of adding the notes as a new category to the enumerated list of non-securities. *Id.*

The four *Reves* factors that determine the note's status as a security are: (1) "the motivations that would prompt a reasonable seller and buyer to enter into [the transaction]," (2) "the 'plan of distribution' of the instrument," (3) "the reasonable expectations of the investing public," and (4) "whether some factor such as the existence of another regulatory scheme significantly reduces the risk of the instrument, thereby rendering application of the Securities Acts unnecessary." *Id.* at 66-67 (quotation omitted). In the present case, the defendants do not argue that the promissory notes bear a strong resemblance to any of the notes that the Supreme Court has explicitly identified as being non-

---

[2]Those notes that, according to the Supreme Court, are not securities include:

> [T]he note delivered in consumer financing, the note secured by a mortgage on a home, the short-term note secured by a lien on a small business or some of its assets, the note evidencing a 'character' loan to a bank customer, short-term notes secured by an assignment of accounts receivable, [] a note which simply formalizes an open-account debt incurred in the ordinary course of business (particularly if, as in the case of the customer of a broker, it is collateralized)[,and] . . . notes evidencing loans by commercial banks for current operations.

*Reves*, 494 U.S. at 65 (quotations omitted).

---

## CONCURRENCE

---

KAREN NELSON MOORE, Circuit Judge, concurring. I concur in the judgment of the majority, but I write separately with respect to Part II.A.1.a of Judge Ryan's opinion because I believe that the promissory notes at issue in this case, like the stock purchase warrants, should be characterized as securities for the purpose of federal and Tennessee securities laws.

As the majority has explained, Plaintiff Jack Bass cannot sustain his securities claims unless he shows, as a threshold matter, that the financial instruments at issue in this case qualify as securities within the meaning of the Securities Act of 1933 and the Securities Exchange Act of 1934. *See Reves v. Ernst & Young*, 494 U.S. 56, 60 (1990). The definition of "security" contained in § 2(a)(1) of the Securities Act of 1933[1] states that a security includes:

> [A]ny note, stock, treasury stock, bond, debenture, evidence of indebtedness, . . . or, in general, any interest or instrument commonly known as a "security," or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing.

15 U.S.C. § 77b(a)(1); *see also* 15 U.S.C. § 78c(a)(10).

---

[1]The Supreme Court has repeatedly held that "'[t]he definition of a security in § 3(a)(10) of the 1934 Act, . . . is virtually identical [to the definition in the Securities Act of 1933] and, for present purposes, the coverage of the two Acts may be considered the same.'" *Reves*, 494 U.S. at 61 n.1 (quotation omitted). Furthermore, the Tennessee statutory definition of the term "security" is virtually identical to the definition in the 1934 Act. *See* TENN. CODE ANN. § 48-2-102(12).

news articles were brought to Bass's attention which revealed both that Technigen/Joytec had never had any technology or product worth investing in, and that Technigen's delisting from the Vancouver Stock Exchange might have been in anticipation of the BCSC consent decree. Bass brought these articles to the attention of Janney at that time; at trial he described the Janney officer to whom he showed the articles as "shocked." In February 1991, Bass brought suit against Technigen and Janney.

After Technigen reached a $350,000 settlement agreement with Bass and dropped out of the case, the charges remaining against Janney were for the violations of :

1. Section 10(b) of the Securities Exchange Act of 1934 (manipulative and deceptive devices in connection with the purchase or sale of any security), 15 U.S.C. § 78j(b);

2. Section 12(a)(1) of the Securities Act of 1933 (civil liabilities arising from sale of unregistered securities or sale of securities without a prospectus), 15 U.S.C. § 77*l*(a)(1);

3. Section 12(a)(2) of the Securities Act of 1933 (civil liabilities arising from misrepresentation of a material fact in a prospectus), 15 U.S.C. § 77*l*(a)(2);

4. Section 15 of the Securities Act of 1933 and Section 20(a) of the Securities Exchange Act of 1934 (controlling person vicarious liability), 15 U.S.C. §§ 77o, 78t(a);

5. Sections 21 and 22 of the Tennessee Securities Act of 1980 (fraudulent acts or devices in connection with the sale or purchase of any security), Tenn. Code Ann. §§ 48-2-121, 48-2-122; and

6.   the common law against intentional and
     negligent misrepresentation.

All securities law claims were dismissed on summary judgment but the district court retained jurisdiction on diversity grounds. The jury returned a verdict of no liability for intentional or reckless misrepresentation, but found Janney liable for negligent misrepresentation. The jury also found that Bass had been contributorily negligent, and apportioned liability 45% to Bass and 55% to Janney. Bass was awarded $350,000 in damages, which was reduced under Tennessee's comparative fault rule to $192,500 due to Bass's contributory negligence. Bass appeals the summary judgment in Janney's favor with regard to the securities law claims; the denial of his own motion for summary judgment with regard to certain securities law claims; the district court's exclusion of certain documentary evidence and expert witness testimony; and the amount of the damage award. The Janney defendants cross-appeal the denial of their motion for judgment as a matter of law, as well as the amount of the damage award.

## II.

### A.  Securities Law Claims

The district court dismissed all of Bass's federal and state securities law claims on the ground that the promissory notes Bass received were not securities. Bass appeals the dismissal of the securities law claims on the ground that both the promissory notes and the warrants for the purchase of Technigen common stock he received in exchange for the $600,000 he made to Technigen were securities as a matter of law.

The district court adopted the Report and Recommendation of a United States Magistrate Judge applying the "family resemblance" test announced by the United States Supreme Court in  *Reves v. Ernst & Young*, 494 U.S. 56 (1990), to determine that the notes were not securities.  Neither the

such tort-feasor "has paid more than the proportionate share of the shared liability."  Tenn. Code Ann. § 29-11-102.

When the jury awarded Bass $350,000 in damages, it was aware that he had requested $600,000 in damages, plus interest and punitive damages. It was also aware that he had already received $350,000 in settlement from Technigen. It does not appear that the jury failed to take into account the amount of the Technigen settlement, nor that requiring Janney to pay its 55% share of the jury award resulted in a payment by Janney of a portion attributable to Technigen.

Furthermore, there has been no showing that Technigen and Janney were tort-feasors jointly causing Bass's damages. Indeed, on the face of it, Technigen was liable to Bass in contract, on the defaulted promissory notes, and not as a joint tort-feasor with Janney. The point is clinched by the fact that the jury expressly assessed the fault in tort of "others" at zero on the verdict form. In other words, not only was Janney not required to pay more than its pro rata share of Bass's damages, it had no joint tort-feasor from whom to seek contribution under the statute. The district court committed no error in refusing to reduce the damage award pursuant to the Act.

## III.

For the foregoing reasons, we **REVERSE** the district court's grant of summary judgment dismissing the plaintiff's federal and state securities law claims and **REMAND** those claims for reconsideration, but **AFFIRM** the judgment of the district court in all other respects.

(1)  It does not discharge any of the other tort-feasors from liability for the injury or wrongful death unless its terms so provide; but it reduces the claim against the others to the extent of any amount stipulated by the release or the covenant, or in the amount of the consideration paid for it, whichever is the greater; and

(2)  It discharges the tort-feasor to whom it is given from all liability for contribution to any other tort-feasor.

(b)  No evidence of a release or covenant not to sue received by another tort-feasor or payment therefor may be introduced by a defendant at the trial of an action by a claimant for injury or wrongful death, but may be introduced upon motion after judgment to reduce a judgment by the amount stipulated by the release or the covenant or by the amount of the consideration paid for it, whichever is greater.

Tenn. Code Ann. § 29-11-105.  This statute was rendered obsolete in 1992 by Tennessee's adoption of a system of comparative fault.  *McIntyre v. Balentine*, 833 S.W.2d 52 (Tenn. 1992).  However, the Tennessee Supreme Court expressly retained the statutory remedy of contribution among tort-feasors for "cases in which prior to *McIntyre* the cause of action arose, the suit was filed and the parties had made irrevocable litigation decisions based on pre-*McIntyre* law." *General Elec. Co. v. Process Control Co.*, 969 S.W.2d 914, 916 (Tenn. 1998).  Bass's complaint was filed in February 1991; the settlement with Technigen took place in March 1992; *McIntyre* was decided in May 1992.  The defendants argue that therefore they may set off the damage award against them by the $350,000 Bass received from Technigen in his settlement with them, pursuant to the statute.

The defendants mischaracterize the Act, which was intended to cover the situation in which two tort-feasors are "jointly or severally liable in tort for the same injury to person or property or for the same wrongful death," but "judgment has not been recovered against all or any of them" and one

Report and Recommendation nor the Order of the district court adopting it addressed the matter of the warrants, but because our review of the judgment below is *de novo* and because we think resolution of this issue is critical to a proper decision in the case, we shall address it.

## 1.  Presence of Securities

### a.  Promissory Notes

In a matter as fundamental to the federal securities laws as the very definition of a security, analysis must begin with the plain language of the Securities Acts themselves.  The Securities Act of 1933 defines securities as

> any *note*, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, . . . put, call, straddle, option, or privilege on any security, . . . or, in general, any interest or instrument commonly known as a "security", or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or *warrant* or right to subscribe to or purchase, any of the foregoing.

15 U.S.C. § 77b(a)(1) (emphasis supplied).  The definition in the Securities Exchange Act of 1934, 15 U.S.C. § 78c(a)(10), is identical except that it exempts notes with a repayment term of less than nine months; despite this subtle difference, the Supreme Court treats these definitions as functionally indistinguishable in almost all cases, *Reves*, 494 U.S. at 61 n.1.  The definition includes both "any note" and "any . . . warrant or right to subscribe to or purchase" any security.  15 U.S.C. § 78c(a)(10).

Under the Tennessee Securities Act of 1980,

> "[s]ecurity" means any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement,

. . . or, in general, any interest or instrument commonly known as a "security," or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing.

Tenn. Code Ann. § 48-2-102(12). This language closely tracks the language of the federal statutory definition. With regard to notes and warrants, the language is identical to that of the 1933 Act's definition.

In *Reves*, the Supreme Court explained, with disarming candor, that for purposes of giving judicial interpretation to the plain meaning of language employed by Congress in enacting a statute, that words do not always mean what they say:

While common stock is the quintessence of a security, and investors therefore justifiably assume that a sale of stock is covered by the Securities Acts, the same simply cannot be said of notes, which are used in a variety of settings, not all of which involve investments. Thus, the phrase "any note" [in the definition of security] should not be interpreted to mean literally "any note," but must be understood against the backdrop of what Congress was attempting to accomplish in enacting the Securities Acts.

*Reves*, 494 U.S. at 62-63 (citation omitted).

The *Reves* Court adopted a "family resemblance" test to determine whether particular notes could be classified as securities.

The test begins with the language of the statute; because the Securities Acts define "security" to include "any note," we begin with a presumption that every note is a security. We nonetheless recognize that this presumption cannot be irrebuttable. As we have said, . . . Congress was concerned with regulating the investment market,

## D.  Damage Award

Both parties appeal the amount of the damages awarded by the jury. In a diversity case, this court will review a jury's damage award under an extremely deferential standard, not disturbing it "'unless it manifests plain injustice, or is so grossly excessive as to be clearly erroneous.'" *Chatman v. Slagle*, 107 F.3d 380, 385 (6th Cir. 1997) (citation omitted).

### 1.  The Plaintiff's Argument

Bass argues that because only he presented evidence at trial as to how damages ought properly to be calculated, the jury was not empowered to award damages in an amount lower than that which he requested. Not surprisingly, Bass was able to produce no case law to support the proposition that the jury was under some compulsion to accept at face value the calculations he presented. Because the jury could quite properly have included in its own calculations the amount of Bass's settlement with Technigen or his retention of the Technigen stock and warrants, we cannot conclude that the jury's award was either plainly unjust or clearly erroneous on these grounds.

### 2.  The Defendants' Argument

The Janney defendants, for their part, argue that Tennessee law provides a statutory right to a setoff of the judgment against them by an amount equal to the settlement between the plaintiff and Janney's erstwhile codefendant, Technigen. The relevant Tennessee statute, a section of the Uniform Contribution Among Tort-feasors Act (the Act), reads as follows:

(a)  When a release or covenant not to sue or not to enforce judgment is given in good faith to one (1) of two (2) or more persons liable in tort for the same injury or the same wrongful death:

which [Bass] subsequently assert[ed]," nor did Bass appear to act with "the intention or expectation that such conduct will be acted upon by the other party." Janney, for its part, did not have "a lack of knowledge and an inability to learn the truth as to the facts in question; . . . reliance on [Bass's] conduct[; or] action based thereon which change[d its] position prejudicially" with regard to Bass's actions and omissions. Ratification is a doctrine unrelated to the purpose the defendants attempt to bend it to.

The defendants' arguments based on principles of waiver, estoppel, and ratification are entirely without merit.

### 3.  Reliance

The defendants' final argument is that Bass could not as a matter of law have relied reasonably or justifiably upon the defendants' investigations in connection with the bridge loan transaction.  Under Tennessee law, "[g]enerally, a party dealing on equal terms with another is not justified in relying upon representations where the means of knowledge are readily within his reach." *Solomon v. First Am. Nat'l Bank of Nashville*, 774 S.W.2d 935, 943 (Tenn. Ct. App. 1989). Furthermore, the defendants argue, Bass was highly experienced as an investor and should have known better than to assume that Janney's interests were aligned with his.  In addition, the information regarding Technigen's reputation was as available to him as to the defendants, and Bass had his own attorney able to conduct any investigations Bass thought necessary.

Despite the defendants' protestations, the question of whether Bass's reliance was reasonable is beyond doubt a question of fact for a jury to decide, and not a fit subject for judgment as a matter of law.  This argument, too, is without merit.

not with creating a general federal cause of action for fraud.

*Id.* at 65 (footnote omitted).  "In an attempt to give more content to that dividing line," the Supreme Court, in a strikingly creative exercise in statutory construction identified the following list of notes which are *not* securities:  notes delivered in consumer financing, notes secured by a mortgage on a home, notes secured by a lien on a small business or some of its assets, notes relating to a "character" loan to a bank customer, short-term notes secured by an assignment of accounts receivables, notes which formalize an open-account indebtedness incurred in the ordinary course of business, and notes given in connection with loans by a commercial bank to a business for current operations.  *Id.*

The Court then established a four-factor framework for determining, first, whether a note bears a resemblance to one of the identified seven instruments, and second, whether an additional category should be added to the list.

The first factor is the motivation prompting the transaction: if the seller's motivation is "to raise money for the general use of a business enterprise . . . and the buyer is interested primarily in the profit the note is expected to generate, the instrument is likely to be a 'security.'"  *Id.* at 66.

Second is the plan of distribution:  if there is "'common trading for speculation or investment,'" the note looks more like a security.  *Id.* (citation omitted).  This factor has historically been problematic in application; in *Marine Bank v. Weaver*, 455 U.S. 551 (1982), the Supreme Court held that the arrangement in that case, by virtue of being a "unique agreement, negotiated one-on-one by the parties," was not a security.  *Id.* at 560.  However, it is clear that paradigmatic securities, such as stocks, can be offered and sold to a single person, while yet remaining securities. *See Landreth Timber Co. v. Landreth*, 471 U.S. 681, 692 (1985).

The third factor is "the reasonable expectations of the investing public." *Reves*, 494 U.S. at 66. Reasonable public expectations will govern the characterization, even where the underlying economic realities belie those expectations. *Id.* at 66-67.

The final consideration is "whether some factor such as the existence of another regulatory scheme significantly reduces the risk of the instrument, thereby rendering application of the Securities Acts unnecessary." *Id.* at 67. In application, this factor comprises, in addition to comprehensive regulatory schemes, the presence or absence of risk-reducing factors such as collateral or insurance. *Id.* at 69.

Although the promissory notes received by Bass bear similarities to at least two of the enumerated categories of notes which are not securities—notes secured by a lien on a small business or some of its assets, and notes given in connection with loans by a commercial bank to a business for current operations, *see id.* at 65—we decline to struggle to fit an atypical peg into a standardized hole when the Supreme Court has provided, in its four-factor test, a tool for custom fitting.

Applying the Supreme Court's test, the first factor is a washout, since the motivation prompting the transaction on Technigen's end is one typical in commercial loan transactions, that is, an effort to raise interim funds to launch a new enterprise, but from Bass's perspective looks more like a transaction for profit. The second factor, the plan of distribution, tilts against the notes being securities, since the transaction was unique, negotiated with a single buyer and negotiated term by term, rather than being offered in a wholesale or potentially wholesale fashion. The third factor is again largely a washout, since the reasonable expectation of the investing public would normally be that bridge loans are not securities, and yet, as Bass points out repeatedly, the term sheet for the transaction prepared by Janney—probably a form document usually used in venture financings—referred to the

failing to act, as to induce a belief that it was his intention and purpose to waive."

*Brewer v. Brewer*, 869 S.W.2d 928, 934 (Tenn. Ct. App. 1993) (citations omitted).

The Tennessee Court of Appeals has stated that the

elements of equitable estoppel as related to the party estopped are (1) conduct which amounts to a false representation or concealment of material facts, or conduct which is calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party subsequently asserts; (2) the intention or expectation that such conduct will be acted upon by the other party; and (3) actual or constructive knowledge of the real facts. The elements as related to the party claiming the estoppel are (1) a lack of knowledge and an inability to learn the truth as to the facts in question; (2) reliance on the conduct of the estopped party; and (3) action based thereon which changes his position prejudicially.

*Aussenberg v. Kramer*, 944 S.W.2d 367, 371 (Tenn. Ct. App. 1996).

Finally, in Tennessee, "[a] ratification occurs when the party, knowing all the facts necessary to form an opinion, deliberately assents to be bound." *Yearby v. Shannon*, No. 03A01-9509-CV-00345, 1996 WL 87446, at *3 (Tenn. Ct. App. Feb. 29, 1996). In general it is a principle of agency, whereby one person assents explicitly or implicitly to be bound by the actions of another.

None of Bass's actions or omissions complained of are such "as to induce a belief that it was his intention and purpose to waive." Similarly, the acts and omissions do not amount to "a false representation or concealment of material facts, or conduct which is calculated to convey the impression that the facts are otherwise than, and inconsistent with, those

arguable that he qualified as a Technigen insider, and as such was prevented by the securities laws from selling Technigen stock without disclosing his knowledge of Technigen's true worth. Finally, even if he was not absolutely barred from selling the stock, the mitigation rule does not require parties to unload junk stock on unwitting investors.

### 2. Waiver, Estoppel, and Ratification

The defendants' second theory to explain why Bass should not be permitted to recover against them is based on principles of waiver, estoppel, and ratification. The defendants argue that Bass's own conduct prevents him from complaining about the transaction. First, Bass knew that Technigen's president was under investigation at the time he extended the first bridge loan. Second, he knew that Nesis had entered into a consent decree with the BCSC at approximately the time he extended the second bridge loan, and yet did not at that time seek rescission of the transaction. Third, he did not bring suit against the defendants until nearly six months after the failure of the Technigen private placement. Fourth, despite his concerns over Technigen's reputation, Bass sought to retain and did retain shares of Technigen stock after the failure of the Technigen offering and as part of his settlement with Technigen. Fifth, the failure to sell the Technigen shares or to exercise the warrants itself amounted to a ratification of the underlying transaction. In sum, the argument amounts to a statement that one who retains the benefits of a transaction should not be permitted to complain about it.

This argument must be addressed in light of Tennessee law. In Tennessee,

> [w]aiver is a voluntary relinquishment or renunciation of a known right. "It may be proved by express declaration; or by acts and declarations manifesting an intent and purpose not to claim the supposed advantage; or by a course of acts and conduct, or by so neglecting and

notes under the rubric of securities. The fourth factor again mitigates against these notes being securities, since, as applied in *Reves*, the existence of collateral is significant as a risk-reducing factor, and these notes were heavily secured by the assets of both Technigen and Joytec, Technigen and Joytec stock, and Joytec's guarantee.

For these reasons, obedience to the Supreme Court's balancing formula in *Reves* requires that we affirm the district court's conclusion that the notes were not securities as a matter of law.

### b. Warrants

However, with regard to the warrants which were included in the transaction as an additional means of enticing Bass into a commitment, a different conclusion is called for. The Janney defendants argue that in the context of a commercial loan, warrants issued secondarily to the underlying loan transaction are not to be considered securities; essentially, this is a version of the "underlying economic reality" approach to securities transactions. The only authority cited for this proposition is *Rispo v. Spring Lake Mews, Inc.*, 485 F. Supp 462 (E.D. Pa. 1980); our own independent research reveals no supporting precedent from this circuit. In *Rispo*, the district court held that a promise, made incidental to a commercial loan transaction, to deliver three shares of stock was not the sale or purchase of a security. *Id.* at 466. Overlooking for the moment that this court is under no obligation to follow the decision of a district court from outside the Sixth Circuit, the holding in *Rispo* was dubious in 1980, in light of the plain language of the definition section of both federal Securities Acts, and increasingly so after 1985, when the Supreme Court decided that stock is a security *per se*, regardless of the particular circumstances in which it changes hands, and further that an investment contract analysis was not applicable to transactions involving paradigmatic securities. *Landreth Timber*, 471 U.S. at 696-97.

An analysis that departs from the plain language of the statutory definition in order to give effect to the apparent underlying intentions of the parties to a transaction is an inappropriate application of judicial authority and flies in the face of the fundamental purposes for which the federal securities laws were drafted. Indeed, of predominant importance is not whether a particular transaction ideally *should* invoke the protections of the securities laws, but rather the certainty enjoyed by the transacting parties that the protections of those laws may be extended to every exchange involving securities. The Securities Acts define warrants as securities no matter what the context in which they change hands and put parties on notice that the securities laws will apply to any exchange of warrants. If the parties do not wish the securities laws to apply to a given transaction, they need only structure it as a straight loan. A contrary rule would be little more than an invitation to litigation: How important a role would the warrants need to play in a transaction for them to rise to the level of securities? This is not the sort of question this court has any mandate, or any inclination, to address.

We believe that the district court erred as a matter of law in dismissing all of Bass's securities law claims on the ground that the promissory notes were not securities. The notes themselves were not securities, but the loan transaction also involved the exchange of warrants, which are securities in whatever context they change hands.

## 2. Reversible Error

Janney argues forcefully that even if the district court committed error in holding that the warrants were not securities, the error was necessarily harmless—at least with regard to the securities fraud counts—in light of the jury verdict which did not find the defendants liable for intentional or reckless misrepresentation. We acknowledge that the essential elements of fraud under the securities laws closely track those for common law fraud. *See Ockerman v. May*

### 1.  Failure to Mitigate

First, claiming that there was insufficient evidence to support the verdict for the plaintiff, Janney argues that Bass unjustifiably failed to mitigate his damages by attempting to exercise his stock warrants, even at a time when the market price of Technigen stock was sufficiently high that his profits on sale would have exceeded $2 million.

Janney is correct that, under Tennessee law,

[g]enerally, one who is injured by the wrongful or negligent act of another, whether by tort or breach of contract, is bound to exercise reasonable care and diligence to avoid loss or to minimize or lessen the resulting damage, and to the extent that his damages are the result of his active and unreasonable enhancement thereof, or due to his failure to exercise such care and diligence, he cannot recover.

*Cook & Nichols, Inc. v. Peat, Marwick, Mitchell & Co.*, 480 S.W.2d 542, 545 (Tenn. Ct. App. 1971). However, to note that Bass should have made efforts to mitigate where possible is a far cry from demonstrating that he had an opportunity to do so and squandered it. Warrants for the purchase of unregistered stock cannot be exercised on a moment's notice. First, Bass would have had to inform Technigen of his desire to exercise, and paid the exercise price. Second, he would have had to request that Technigen register the converted shares, an expensive and time-consuming process, and one Technigen might have balked at entering into on behalf of an opposing party in a lawsuit. Third, he would then have had to sell the shares. It is probable that the attempt to sell so many shares at once would have had an immediate effect on the market price for Technigen common stock, especially given the volatility it had demonstrated during the period in question. There is therefore no reason to believe that Bass would have been able to sell his shares for $2 million even had he tried. In addition, as Bass pointed out at trial, it is

Similarly, the court's refusal to permit the plaintiff's securities law expert to testify was not an abuse of discretion. Bass complains that his case for common law fraud was prejudiced by the fact that the jury was never permitted to hear testimony regarding Janney's affirmative, statutory duty of due diligence. In fact, that duty had no impact on the cause of action for common law fraud.

The securities laws are relevant to the bridge loan transaction solely by virtue of the presence of the Technigen warrants, which were included as consideration for the bridge loans Bass extended to Technigen. These warrants were not warrants for the purchase of the securities Janney was underwriting, but rather for previously issued Technigen common stock. Therefore, with regard to the warrants whose presence in the transaction invoked the federal and state securities laws, Janney was not an underwriter, and therefore owed no duty to Bass arising out of the securities laws.

With regard to the Technigen offering for which the Bass loans were a bridge financing, Janney *was* an underwriter. As an underwriter, Janney owed a duty of due diligence to Technigen but not, we are satisfied, to Bass, because Bass had no direct involvement in that offering. Any duty Janney owed to Bass arose not from the securities laws but rather from Janney's role in soliciting Bass's participation in the transaction. The jury knew that Janney solicited Bass's participation when it found that Janney lacked intent to defraud.

Bass has failed to demonstrate sufficient evidence of prejudice against his case to warrant a finding that the district judge abused his discretion in excluding the specified evidence.

### C.  Jury Verdict on Common Law Fraud

The defendants cross-appeal the jury verdict on common law fraud, advancing a number of theories as to why Bass should not have been permitted to prevail at trial.

*Zima & Co.*, 27 F.3d 1151, 1156 (6th Cir. 1994). However, we are not persuaded that the structural similarity between the two causes of action is necessarily dispositive of the dispute in this case.

Although the essential elements of common law and securities fraud are the same, the securities laws impose a special duty on underwriters to perform a so-called "due diligence" investigation of the issuer of any securities they underwrite. Because the securities laws properly apply to the bridge loan transaction as a result of the exchange of warrants with the promissory notes, and because Janney was the lead underwriter for the private placement of Technigen securities for which the loans were a bridge financing, Janney was under a statutorily imposed duty to perform due diligence on Technigen and Joytec. The jury below was not instructed as to Janney's duty of due diligence. We therefore decline to accept Janney's invitation to treat the error as harmless as a matter of law.

### 3.  The Plaintiff's Motion for Summary Judgment

Bass argues that it is he, rather than the defendants, who is entitled to judgment as a matter of law on at least two of his securities law claims, namely, the violation of Section 10(b) of the Securities Exchange Act of 1934 and that of Section 21 of the Tennessee Securities Act of 1980. He alleges that the Janney defendants omitted to supply material information which reasonable minds could not disagree would influence his decision to accept the Technigen securities. First, the Janney defendants internally circulated a memo stating their belief that the private placement of Technigen securities that they were underwriting would not be successful unless the price of Technigen common stock rebounded from approximately $1.50 to $2.50; it had dropped to $1.50 from a recent high of around $15.00. This memo was not provided to Bass. Second, the defendants failed to disclose the contents of the negative newspaper articles regarding Technigen, although Bass acknowledges that the defendants

were not aware of the contents of these articles. Third, the defendants delayed disclosure of the fact that Technigen's president had been banned from the Vancouver Stock Exchange.

In addition, Bass claims that the remaining elements of a claim under either anti-fraud provision have been met as a matter of law; those elements are scienter, reasonable reliance, and loss causation. Bass would have it that the omissions enumerated above are reckless *per se*, and relies on presumptions he describes as irrebuttable to demonstrate reliance and causation.

We are not persuaded by the plaintiff's reasoning. "Summary judgment is appropriate only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Moreover, the court is to construe the evidence and all inferences to be drawn from it in the light most favorable to the nonmoving party." *Kraus v. Sobel Corrugated Containers, Inc.*, 915 F.2d 227, 229 (6th Cir. 1990) (citations omitted). Here, issues of material fact abound. With regard first to the alleged omissions, Janney produced testimonial evidence at trial disputing the materiality of the undisclosed facts. Construing this testimonial evidence in the light most favorable to Janney, Bass's motion could not have been granted by the district court. Similarly, the Janney defendants dispute the recklessness of the alleged omissions, creating another genuine issue of material fact. Finally, Bass has not even proven what portion, if any, of the $600,000 purchase price he paid for the $600,000 interest-bearing promissory notes and the stock purchase warrants could properly be allocated to the warrants, let alone that any of his financial losses arose from his purchase of the warrants.

In short, because genuine issues of material fact remain, Bass was not entitled to judgment as a matter of law, and we will therefore not disturb the judgment of the district court in this respect.

## B. Evidentiary Rulings

Bass complains that the district court prevented him from introducing some of his evidence regarding Technigen's reputation as a "scam company." He argues that his common law fraud case was prejudiced because he was not permitted to demonstrate the extent and ubiquity of Technigen's poor reputation. He complains further that his own expert witness was excluded from testifying, and that the defendants' expert witness was permitted to testify as to the industry standard of care for underwriters with regard to bridge loan participants, again, with prejudicial effect to his common law fraud case.

This court reviews evidentiary rulings of the kind complained of here for abuse of discretion only, and "we will not reverse a judgment unless we believe that errors at trial had a substantial effect on the final result." *In re Air Crash Disaster*, 86 F.3d 498, 532-33 (6th Cir. 1996). In general,

[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by . . . considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Fed. R. Evid. 403.

In this case, the district judge was within his discretion to determine that admission of the entire corpus of negative articles would be cumulative, redundant, and a waste of time. The point that Technigen had an easily ascertainable reputation as a shady operation could easily be made with the introduction of only a small number of articles, and indeed was a fact not really contested by the defendants. To have permitted a dead horse to be flogged at great length in the jury's presence would not merely have wasted judicial time and resources; it also would have risked prejudicing the jury well beyond the intrinsic probative value of the evidence. The district judge did not abuse his discretion in excluding some of the negative articles.