# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
### August 25, 2010 Session

## JAMES AND PATRICIA CULLUM, ET AL. V. BAPTIST HOSPITAL SYSTEMS, INC., ET AL.

**Appeal from the Circuit Court for Davidson County**
**No. 04C-2121     Hamilton V. Gayden, Jr., Judge**

---

**No. M2009-01980-COA-R3-CV - Filed February 16, 2011**

---

This is an appeal from a jury verdict in a medical malpractice case. Plaintiffs, parents of child who suffered severe, permanent brain injuries during the course of his labor and delivery, filed suit against their physician, physician's employer, and related hospitals. The physician and her employer settled prior to trial, leaving the related hospitals as the only defendants. This case has been tried twice. Following the first trial, the jury returned a verdict in favor of defendants, which the trial court set aside pursuant to the thirteenth juror rule. The second trial resulted in a verdict for plaintiffs, with the jury assigning 3.75 percent of fault to the defendants and 96.25 percent of fault to the nonparty physician. Because the evidence shows that the members of the jury agreed to be bound by the result of a predetermined averaging process, we have concluded that the jury reached a quotient verdict, which is impermissible. Consequently, we reverse and remand the case for a new trial.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Reversed and Remanded**

RICHARD H. DINKINS, J., delivered the opinion of the court, in which PATRICIA J. COTTRELL, P. J., AND M.S., and FRANK G. CLEMENT, JR., J., joined.

Steven R. Walker, Memphis, Tennessee, and Joseph P. Bednarz, Sr., Nashville, Tennessee, for the appellants, James Cullum and Patricia Cullum.

James E. Looper, Jr., Brandy Marie Burnette, and John Everette Hall, Jr., Nashville, Tennessee, for the appellees, Baptist Hospital Systems, Inc., and Baptist Women's Health Center, LLC.

**OPINION**

## I. Factual Background and Procedural History

This medical malpractice case stems from the birth of Samuel Cullum, the son of Patricia and James Cullum (collectively referred to as "Plaintiffs"). On May 1, 2000, Mrs. Cullum was admitted to Baptist Women's Health Center for a scheduled induction of labor. Mrs. Cullum's obstetrician, Susan E. Mackey, M.D. ("Dr. Mackey"), together with several nurses, supervised her labor and delivery. Samuel was born with cerebral palsy and severe brain damage,[1] which Plaintiffs allege resulted from a delay in his delivery.

On July 22, 2004, Plaintiffs filed suit against Women's Health Alliance, P.C., Dr. Mackey, Baptist Women's Health Center, L.L.C., and Baptist Hospital, Inc., alleging negligence in the care and treatment of Mrs. Cullum and negligence in the care and delivery of Samuel. The allegations of the complaint included the following:

> (i) [defendants] failed to properly conduct in a timely manner necessary or adequate tests, studies or procedures to confirm the well-being of the fetus, (ii) [defendants] failed to properly and timely monitor the fetus and detect fetal stress and distress, (iii) [defendants] subjected the fetus to a substantially increased risk of harm, (iv) [defendants] unreasonably delayed the delivery of the fetus, (v) [defendants] failed to perform a timely Cesarean section, even after the obvious risk of brain damage to the fetus was known or should have been known, (vi) and [defendants] failed to perform necessary interventions and obtain timely consultations to reduce the risk of irreversible brain damage and death.

On March 5, 2007, Plaintiffs and Dr. Mackey and Women's Health Alliance, P.C. reached a settlement; as a result Dr. Mackey and Women's Health Alliance, P.C. were dismissed as parties to the action. Thereafter, Baptist Women's Health Center, L.L.C. and Baptist Hospital, Inc. ("Defendants") filed a motion to amend their answer to assert the affirmative defense of comparative fault, naming Dr. Mackey as a comparative tortfeasor.[2]

---

[1] The parties stipulated that, "Samuel Cullum suffered injuries and has abnormalities limited exclusively to the deep gray matter structures of his brain, including the basal ganglia, thalamus, and brain stem."

[2] Defendants' third affirmative defense in their amended answer reads as follows:

If injuries or damages alleged in the Complaint were the result of negligence, which is denied, Defendants allege that such injuries were cause [sic], solely or in part, by acts or omission [sic] of others, named or unnamed. Defendants reserve and rely upon the doctrine of comparative fault including both party and non-party apportionment. Defendants,

Plaintiffs did not oppose the motion, and it was granted by the trial court.

The first trial on this matter was held on December 3, 2007 before Judge Brothers, in the Sixth Circuit Court for Davidson County. On December 17, 2007, the jury returned a verdict in favor of Defendants, finding that the nursing staff of Baptist Women's Pavilion Hospital[3] complied with the standard of care. Plaintiffs moved for a new trial, and on April 15, 2008, Judge Brothers entered an Order Granting Plaintiffs' Motion for New Trial stating:

> [T]he Court independently weighed the evidence as thirteenth juror and is of the opinion that the evidence preponderated in favor of the Plaintiff and against the verdict of the jury. The Court is not satisfied with the verdict and cannot approve the verdict and is of the opinion that the Motion for a New Trial should be sustained on that basis.

Subsequently, Judge Brothers recused himself, and the case was transferred to the First Circuit Court for Davidson County. A second jury trial commenced on June 1, 2009 which resulted in a verdict for Plaintiffs. The court entered an Order of Judgment on June 29, 2009 stating:

> [T]he jury unanimously found that the nursing staff of Baptist Women's Health Center, LLC were the apparent agents of Baptist Hospital, Inc.; and Susan E. Mackey, M.D. was 96.25% at fault and the nursing staff of Baptist Women's Pavilion Hospital was 3.75% at fault. . . . [T]he total damages are $4,380,627.97. Thus attributing 3.75% to the Defendants, Baptist Hospital, Inc. and Baptist Women's Health Center, LLC, results in a judgment of $164,273.55 against these defendants.

Plaintiffs filed a Motion for New Trial and Defendants filed a Motion for Post Trial Relief, Including Judgment N.O.V., or Alter or Amend Judgment. Both parties moved for discretionary costs. The trial court overruled both motions and awarded Plaintiffs $76,338.11 in discretionary costs. Plaintiffs filed a timely Notice of Appeal.

---

Baptists Hospital System, Inc., and Baptist Women's Health Center LLC, specifically allege fault against Dr. Susan Mackey, and state that Dr. Mackey deviated the [sic] recognized standards of professional practice for a physician practicing in the fields of obstetrics and gynecology in Nashville, Tennessee, in May, 2000.

[3] The named defendant Baptist Women's Health Center, L.L.C., did business under the name "Baptist Women's Pavilion Hospital."

## II. Issues on Appeal

Both Plaintiffs and Defendants have raised several issues on appeal. We find one issue to be dispositive of the appeal: Whether the jury used an impermissible quotient verdict to apportion fault?[4]

## III. Discussion

### A. Quotient Verdict

Plaintiffs had the burden of proving the alleged quotient verdict by a preponderance of the evidence. *See Smith v. Gann*, No. 01-A-01-9209-CV00357, 1993 WL 21988, at *2 (Tenn. Ct. App. 1993) (citations omitted). In support of their allegation that the jurors reached a quotient verdict, Plaintiffs presented affidavits from five jurors, the admissibility of which is governed by Tenn. R. Evid. 606(b).[5] The relevant portions of the jurors' affidavits are as follows:

> The next step of apportioning a percentage of fault proved to be equally contentious due to the fact that a minority of jurors wanted to assign a very low percentage of fault to the nursing staff (as low as 1%) while the majority wanted to apportion a higher percentage.

---

[4] Defendants argue that Plaintiffs waived their contention that the jury reached an impermissible quotient verdict by not polling the jury. This argument is without merit as it was not necessary for the jury to be polled in order to determine whether the process leading to the verdict was proper. "The object of polling the jury is for the purpose of ascertaining for a certainty the individual juror's verdict. It is not to determine the mode in which they arrived at the verdict." *Dixon Stave & Heading Co. v. Archer*, 291 S.W.2d 603, 609 (Tenn. Ct. App. 1956).

[5] Tenn. R. Evid. 606(b), entitled Inquiry Into Validity of Verdict or Indictment is as follows:

Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon any juror's mind or emotions as influencing that juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes, *except that a juror may testify on the question of whether* extraneous prejudicial information was improperly brought to the jury's attention, whether any outside influence was improperly brought to bear upon any juror, or *whether the jurors agreed in advance to be bound by a quotient or gambling verdict without further discussion*; nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes.

Tenn. R. Evid. 606(b) (emphasis added).

In an effort to avoid a hung jury we all agreed to individually assign a percentage of fault to each defendant. Each individual percentage was tallied and then divided by the number twelve (12). As a result, we assigned 3.75% of fault to the nursing staff and 96.25% to Dr. Mackey. It was my understanding that we were bound by this number and that we would move on to the next phase which was to apportion an amount of damages to be awarded to Mr. and Mrs. Cullum.

Stewart Aff. ¶¶ 9–10.

We then attempted to assign an amount of fault to each defendant. This was difficult due to the fact that we could not agree on a percentage of fault to each defendant. The percentages of fault to the nursing staff diverged widely between the jurors from 1% to 10% to 25%, to what I believe was as high as 50%.

In an effort to avoid a hung jury we all agreed to individually assign a percentage of fault to each defendant. After we each assigned our percentages of fault, the total was tallied and then divided by all twelve (12) jurors. This ended up totaling 3.75% of fault to the nursing staff and 96.25% to Dr. Mackey. I felt as though I was bound by this number and agreed to this process so that we could move on to the next step of decideing an amount of damages for the Cullums and to avoid a hung jury. If we did not agree to add all the percentages up and divide then by the number twelve (12), I believe we may have had a hung jury because the percentages of fault differed so much between each juror.

Sanchez Aff. ¶¶ 11–12.

. . . we were able to move on and assign a percentage of fault to the defendants.

However; this was not easy. One of the jurors who initially voted that Nurse Austin was not negligent, let it be known that he would only agree to vote in favor of the hospital's negligence if it was a very low number, for example, 1%. Another juror wanted to assign 50% of fault to the hospital.

Realizing that we were not getting anywhere, and in order to avoid a hung jury, we all agreed that we would each individually assign a percentage of fault to each defendant, be bound by that number, and then divide the total by all twelve jurors. By using this method and locking in our percentages of fault we were able to come up with 3.75% to the hospital and 96.25% to Dr. Mackey, and move on to the next phase of awarding an amount of damages to the Cullums

Elmore Aff. ¶¶ 8–10.

> In an effort to avoid a hung jury we all agreed to individually assign a percentage of fault to each defendant. Each individual percentage was tallied and then divided by the number twelve (12). . . . It was my understanding that we were bound by this number and that we would move on to the next phase . . . . It is my opinion that if we had not compromised as described above, we would have had a hung jury.

Driscoll Aff. ¶¶ 9–10.

> The next step of apportioning a percentage of fault proved to be equally contentious due to the fact that a minority of jurors wanted to assign a very low percentage of fault to the nursing staff (as low as 1%) while the majority wanted to apportion a higher percentage.
> In an effort to avoid a hung jury we all agreed to individually assign a percentage of fault to each defendant. Each individual percentage was tallied and then divided by the number (12). . . It was my understanding that we were bound by this number and that we would move on to the next phase which was to apportion an amount of damages to be awarded . . . .

Johnson-Nance Aff. ¶¶ 9–10.

When a jury agrees in advance to be bound by a verdict reached through an averaging process, the resulting verdict is a "quotient" or "gambling" verdict. Our Supreme Court has opined that "[a] verdict arrived at by averaging various figures is not, in and of itself, illegal. It is only when there is an antecedent agreement, express or implied, to abide by the results that a quotient verdict will be vitiated." *Odom v. Gray*, 508 S.W.2d 526, 532 (Tenn. 1974). Thus, the most important inquiry in determining if a jury reached a quotient verdict is whether the jurors agreed in advance to be bound by the outcome of their mathematical process. *See Young v. Norfolk S. Ry. Co.*, No. 03A01-9812-CV-00414, 1999 WL 105970, at *4 (Tenn. Ct. App. 1999) (a "quotient verdict requires the condition precedent that all jurors must agree to be bound by the outcome or the process is merely part of the jury's deliberations . . . ."); *see also Mayor of Morristown v. Inman*, 342 S.W.2d 71 (Tenn. Ct. App. 1960).

The affidavits show that the members of the jury, in the course of contentious deliberations and in order to avoid a hung jury, agreed to use a mathematical computation to apportion liability among the tortfeasors and that they would return the result as their verdict. Defendants offered no evidence to the contrary. The process employed by the jury

resulted in a quotient verdict.[6] While the trial court denied a new trial upon its determination that " it is not possible to average the numbers as alleged by Plaintiffs and come up with a 3.75% verdict," it is the jury's antecedent agreement to abide by the results of the averaging process rather than the results of the process that vitiates the verdict. *Odom*, 508 S.W.2d at 532 (Tenn. 1974).

Because the verdict was reached in an impermissible manner, we must set it aside and remand the case for a new trial.

## B. Proceedings on Remand

Although our reversal of the jury's verdict pretermitts resolution of the other issues presented, we discuss two additional issues in an effort to assist the trial court and parties on remand.

### 1. Evidence of Dr. Mackey's Settlement

Plaintiffs contend that Tenn. Code Ann. § 29-11-105(b)[7] precludes admission of any evidence regarding Dr. Mackey's settlement and that, consequently, the trial court erred when it allowed information of Dr. Mackey's settlement to come before the jury. This statute, however, is part of the Uniform Contribution Among Tortfeasors Act and was intended to apply in cases in which two tortfeasors are "jointly or severally liable in tort for the same injury to person or property or for the same wrongful death," but "judgment has not been recovered against all or any of them," and one such tortfeasor "has paid more than the proportionate share of the shared liability." Tenn. Code Ann. § 29-11-102. We agree with

---

[6] Originally, a quotient verdict referred to a process in which jurors agreed to be bound by an averaged dollar figure for the amount of damages awarded. *See Elledge v. Todd*, 20 Tenn. (1 Hum.) 43, 43 (Tenn. 1839) ("a jury shall not agree among themselves that each shall specify the amount for which he is willing to find a verdict, divide the whole by twelve, and return the sum thus produced as the amount of their deliberations . . . ."). In 1995 this Court reasoned that the "policy behind making [quotient verdicts] illegal is equally applicable to the relatively new concept of comparative fault." *McCall v. Delta Beverage Group, Inc.*, No. 02A01-9404-CV-001000, 1995 WL 256743, at *1 (Tenn. Ct. App. 1995) (reversing jury verdict where one juror's affidavit averred that jurors used a quotient verdict to arrive at percentages of fault in a personal injury suit).

[7] Tenn. Code Ann. §29-11-105(b) states:

> (b) No evidence of a release or covenant not to sue received by another tort-feasor or payment therefor may be introduced by a defendant at the trial of an action by a claimant for injury or wrongful death, but may be introduced upon motion after judgment to reduce a judgment by the amount stipulated by the release or the covenant or by the amount of the consideration paid for it, whichever is greater.

the Sixth Circuit Court of Appeals that Tenn. Code Ann § 29-11-105 "was rendered obsolete in 1992 by Tennessee's adoption of a system of comparative fault." *Bass v. Janney Montgomery Scott, Inc.*, 210 F.3d 577, 591 (6th Cir. 2000) (citing *McIntyre v. Balentine*, 833 S.W.2d 52 (Tenn. 1992)). Instead, Tenn. R. Evid. 408, concerning compromise and offers of compromise, governs the admission of evidence of the settlement.

Tenn. R. Evid. 408 allows evidence of a settlement agreement to be admitted for the purpose of proving bias or prejudice of a witness, but not for the purpose of proving liability. Plaintiffs complain that the fact that Dr. Mackey had settled with them was mentioned by counsel for Defendants at various points during the trial to argue that Dr. Mackey was liable. We have reviewed the citations to the record and agree that the many of the references by counsel for Defendants to Dr. Mackey's settlement were inappropriate and contrary to Rule 408 inasmuch as they were not made to show bias on the part of Dr. Mackey.[8] We caution counsel on remand to limit references to Plaintiffs' settlement with Dr. Mackey to those uses permissible under Rule 408. *See also* Tenn. R. Evid. 616.

## 2. Directed Verdict Against Dr. Mackey[9]

At the close of proof, Defendants made a motion for directed verdict "on the issue of Dr. Mackey's liability," asserting that a directed verdict was appropriate because, "Dr. Mackey never, in her own testimony, offered any opinion meeting the qualifications of Tennessee that she complied with the applicable standard of care."

---

[8] For instance, one reference to the settlement, which occurred during *voir dire* was as follows:

. . . And I want you to assume at that time, the plaintiffs took the position that Dr. Mackey was responsible for the damages to the child, and that Dr. Mackey was negligent.

Let me ask you first: If the plaintiffs take that position and file–everybody understands a lawsuit is a serious matter. If the plaintiffs take that position, shouldn't they continue to take that position throughout the lawsuit?

Anybody think its okay to just change, especially after the doctor settled, that you're going to change your theory? Anybody believe that's appropriate.
* * *
Do you think its appropriate to change your theory once you've settled with another party? Anybody believe that's appropriate?
* * *
Now, if the plaintiffs file a lawsuit and allege that the physician was negligent. And that that negligence caused the injury. And that injury caused certain damages. And if they settle their case with the physician, is it appropriate for the hospital, in defending its nurses, to say, hold it, you blamed the physician, and the jury ought to be able to consider whether or not the physician was the one that caused it, as you alleged in your lawsuit, and as you settled.

[9] We address the procedural propriety of the directed verdict even though this issue was not expressly raised by either party. *See* Tenn. R. App. P. 36(b).

8

Motions for directed verdict are governed by Tenn. R. Civ. P. 50.01 which states, in pertinent part: "A motion for a directed verdict may be made at the close of the evidence offered by an opposing party or at the close of the case. The court shall reserve ruling until all parties alleging fault against any other party have presented their respective proof-in-chief." Tenn. R. Civ. P. 50.01. The rule expressly contemplates that the motion for directed verdict is to be made by a "party" against an "opposing party."[10] In this case, however, Dr. Mackey had been dismissed and was no longer a party at the time Defendants made their motion for directed verdict. We are aware of no authority for the court to direct a verdict against a nonparty.[11] Consequently, the court should not entertain a motion for directed verdict against Dr. Mackey, a nonparty, in the future.

## IV. Conclusion

For the reasons set forth above, we reverse the verdict and remand the case for a new trial. The award of discretionary costs is vacated without prejudice to either party to reapply for costs upon completion of proceedings on remand.

_____
RICHARD H. DINKINS, JUDGE

---

[10] The record does not reflect that Defendants made a claim for relief against Dr. Mackey during the time she was a party to the action, and the assertion of the affirmative defensive of comparative fault was not a "claim" upon which relief could be granted. To the extent Defendants felt that Dr. Mackey was 100 percent responsible, the proper motion would have been for a directed verdict in Defendant's favor.

[11] As a practical matter, the motion was unnecessary. The fact that Dr. Mackey had been dismissed from the case had no bearing on the Defendants' ability to introduce proof of any responsibility they asserted she bore nor did it prohibit them from making arguments to the jury on the basis of such proof. *See Carroll v. Whitney*, 29 S.W.3d 14 (Tenn. 2000) (holding that under system of comparative fault, a jury may apportion fault to a party notwithstanding the party's immunity from liability); *Dotson v. Blake*, 29 S.W.3d 26 (Tenn. 2000) (holding that jury may apportion fault to persons who are "effectively immune," such as those protected by a statute of repose).