**Gerald J. STOIBER, Petitioner,**

v.

**SECURITIES AND EXCHANGE COMMISSION, Respondent.**

No. 98–1062.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 9, 1998.

Decided Dec. 8, 1998.

Thomas D. Birge argued the cause and filed the briefs for petitioner.

Randall W. Quinn, Assistant General Counsel, Securities and Exchange Commission, argued the cause for respondent. With him on the brief were Jacob H. Stillman, Associate General Counsel, and Paul Gonson, Solicitor. Susan K. Straus, Attorney, entered an appearance.

Before: WALD, WILLIAMS and HENDERSON, Circuit Judges.

Opinion for the Court filed by Circuit Judge WALD.

WALD, Circuit Judge:

Petitioner Gerald Stoiber is an Illinois broker associated with American Investment Services, Inc. ("AIS"). AIS is a member of the National Association of Securities Dealers, Inc. ("NASD"), a self-regulatory organization in the securities field. Stoiber borrowed a total of $495,000 from his customers, gave the lenders promissory notes in exchange, and used most of the money to invest

in commodities. The NASD filed disciplinary charges against him, asserting that he violated the NASD Rules of Fair Practice by selling securities (the notes) without giving AIS prior written notice. Stoiber was sanctioned by the NASD and appealed to the Securities and Exchange Commission ("SEC" or "Commission"), which affirmed the sanctions. *See In re Gerald James Stoiber*, 65 S.E.C. Docket 1097 (1997). The SEC denied a request for reconsideration. *See In re Gerald James Stoiber*, 66 S.E.C. Docket 731 (1998).

Stoiber petitions for review of the SEC's decision under 15 U.S.C. § 78y. He argues that the promissory notes are not securities, that the SEC misapplied the test articulated by the Supreme Court for determining whether a note is a security, that the Commission abused its discretion by approving the sanctions, and that the sanctions violate the Eighth Amendment's Excessive Fines Clause. We deny the petition for review because the SEC properly concluded that the notes are securities, the SEC did not abuse its discretion, and Stoiber waived the Excessive Fines argument by not raising it before the Commission.

## I. BACKGROUND

From 1991 to 1993, Stoiber approached thirteen customers and asked to borrow various sums of money totaling $495,000.[1] He explained that most of the money would be used for financing commodities trading in his own trading account and the rest for personal uses.[2] Each customer gave him $10,000 to $200,000 and Stoiber executed unsecured promissory notes in return. The notes provided for terms of two to five years[3] and fixed interest rates ranging from six to twelve percent. The record indicates that the interest rate on many of the notes was about two points over the prime rate at the time of execution. Stoiber also borrowed money from his parents but did not give

them any promissory notes; that borrowing was not part of the disciplinary action.

Stoiber had known the note holders, on average, for over nine years when the notes were executed. He testified before the NASD that he has meaningful social relations with all of them beyond the usual broker-customer relationship. He explained, for example, that they sent his children gifts on their birthdays and one is like a mother to him.

The National Futures Association ("NFA") conducted a commodities review of AIS in 1993. The NFA examiner learned of the notes and informed the NASD and the state of Illinois. Both commenced investigations. The Illinois investigation led to an agreement with Stoiber that he would offer rescission to the note holders; every note holder declined the offer.

On April 6, 1994, the NASD charged Stoiber with violations of Sections 1 and 40 of Article III of the NASD Rules of Fair Practice (since renamed Rules 2110 and 3040). Section 1 requires that "[a] member, in the conduct of his business, shall observe high standards of commercial honor and just and equitable principles of trade." Section 40 is the focus of the allegations against Stoiber. It provides, in relevant part:

(a) *Applicability*—No person associated with a member shall participate in any manner in a private securities transaction except in accordance with the requirements of this section.

(b) *Written Notice*—Prior to participating in any private securities transaction, an associated person shall provide written notice to the member with which he is associated describing in detail the proposed transaction and the person's proposed role therein and stating whether he has received or may receive selling compensation in connection with the transaction; provided however that, in the case of a series of

---

**1.** The proper initial date is ambiguous in the NASD's complaint. It first describes the period in question as March 1, 1992 to September 23, 1993. Eleven notes were executed during that period. The complaint, however, also includes a chart listing thirteen notes executed between March 1, 1991 and September 23, 1993. The record contains numerous indications from both parties that thirteen notes are under review.

**2.** Stoiber estimated that he spent $50,000 on personal expenses (a $20,000 payment toward his mortgage and the rest for credit card and hospital bills).

**3.** Some were subsequently extended.

related transactions in which no selling compensation has been or will be received, an associated person may provide a single written notice.

The NASD asserted that the promissory notes are securities, a prerequisite to the applicability of Section 40, and that Stoiber sold them without giving AIS prior written notice.[4]

A hearing was held before the NASD District Business Conduct Committee for District No. 8 which found that Stoiber had violated Sections 1 and 40. On appeal, the NASD National Business Conduct Committee agreed. The National Committee censured Stoiber, suspended him for six months, required $450,000 in restitution (the amount borrowed that was still outstanding), assessed costs totaling $1,299.25, and imposed a $450,000 fine, but allowed the fine to be reduced by the amount of restitution paid within sixty days. Stoiber appealed to the SEC which affirmed the NASD and subsequently denied a request for reconsideration.[5]

## II. Discussion

### A. *Whether the Promissory Notes are Securities*

Stoiber argues that the Commission erred in determining that the promissory notes he executed in return for the funds provided by his customers are properly classified as securities. If the notes are not securities, he could not be held to have violated Section 40.

The definition of "security" in section 3(a)(10) of the Securities Exchange Act of 1934, the source of the SEC's authority in this matter, includes a long list of financial instruments, beginning with "any note."[6] Although courts initially interpreted "any note" literally, *see* Harold S. Bloomenthal & Holme Roberts & Owen, *Securities Law Handbook* § 2.04[2], at 42 (1998 ed.), an inquiry into whether a particular note is a security has become much more demanding under the test articulated by the Supreme Court in *Reves v. Ernst & Young*, 494 U.S. 56, 110 S.Ct. 945, 108 L.Ed.2d 47 (1990). The Court stated there that "the phrase 'any note' should not be interpreted to mean literally 'any note,' but must be understood against the backdrop of what Congress was attempting to accomplish in enacting the Securities Acts." *Id.* at 63, 110 S.Ct. 945. Congress' purpose "was to regulate *investments*, in whatever form they are made and by whatever name they are called." *Id.* at 61, 110 S.Ct. 945 (emphasis in original).

█ Under the *Reves* "family resemblance" test, every note is first presumed to

---

4. The lack of written notice is not disputed. Stoiber claims, however, that he gave oral notice to James Burgauer, the AIS director of compliance and part owner of the firm. Both Stoiber and Burgauer agreed that, before the first note transaction, Stoiber asked Burgauer about how he should document any borrowing, and Burgauer gave him a copy of a promissory note he had on file. Stoiber claims that he told Burgauer that he might ask customers for money, but Burgauer did not remember this aspect of the conversation.

5. The SEC did not address whether, if the notes are not securities, Stoiber had nonetheless violated Section 1, a conclusion the NASD National Committee reached with little explanation. The SEC addressed the Section 1 charge only in terms of the Section 40 charge, stating that violation of the latter established violation of the former, a link that petitioner does not contest. *See In re Gerald James Stoiber*, 65 S.E.C. Docket at 1101 n.22.

6. The term is defined as

any note, stock, treasury stock, bond, debenture, certificate of interest or participation in any profit-sharing agreement or in any oil, gas, or other mineral royalty or lease, any collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit, for a security, any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities (including any interest therein or based on the value thereof), or any put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency, or in general, any instrument commonly known as a "security"; or any certificate of interest or participation in, temporary or interim certificate for, receipt for, or warrant or right to subscribe to or purchase, any of the foregoing; but shall not include currency or any note, draft, bill of exchange, or banker's acceptance which has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity of which is likewise limited.

15 U.S.C. § 78c(a)(10). None of the notes here fall under the short term exception.

be a security but the presumption may fall away under either step of a two-tiered analysis. *See id.* at 67, 110 S.Ct. 945. In the first step the notes under review are compared to several types of notes that the Court specifically said are not securities. Those are

> the note delivered in consumer financing, the note secured by a mortgage on a home, the short-term note secured by a lien on a small business or some of its assets, the note evidencing a 'character' loan to a bank customer, short-term notes secured by an assignment of accounts receivable, [ ] a note which simply formalizes an open-account debt incurred in the ordinary course of business (particularly if, as in the case of the customer of a broker, it is collateralized)[, and] . . . notes evidencing loans by commercial banks for current operations.

*Id.* at 65, 110 S.Ct. 945 (quotation marks and citation omitted). The comparison between the note in question and the excluded notes is to be made by considering four factors: (1) "the motivations that would prompt a reasonable seller and buyer to enter into [the transaction]," (2) "the 'plan of distribution' of the instrument," (3) "the reasonable expectations of the investing public," and (4) "whether some factor such as the existence of another regulatory scheme significantly reduces the risk of the instrument, thereby rendering application of the Securities Acts unnecessary." *Id.* at 66–67, 110 S.Ct. 945. The note is not a security if this four-factor comparison reveals a "strong resemblance" to one of the enumerated types of notes. *Id.* at 67, 110 S.Ct. 945. If a strong resemblance is not found, the court invokes the second step of the analysis—"the decision whether another category should be added. . . ." *Id.* This decision "is to be made by examining the same [four] factors." *Id.* Whether a note is a security is a question of law, so the court applies this test *de novo. See SEC v. Life Partners, Inc.,* 87 F.3d 536, 541 (D.C.Cir. 1996).[7]

### 1. *The First* Reves *Factor—Motivation*

*Reves* explains the first factor as follows:

> First, we examine the transaction to assess the motivations that would prompt a reasonable seller and buyer to enter into it. If the seller's purpose is to raise money for the general use of a business enterprise or to finance substantial investments and the buyer is interested primarily in the profit the note is expected to generate, the instrument is likely to be a "security." If the note is exchanged to facilitate the purchase and sale of a minor asset or consumer good, to correct for the seller's cashflow difficulties, or to advance some other commercial or consumer purpose, on the other hand, the note is less sensibly described as a "security."

*Reves,* 494 U.S. at 66, 110 S.Ct. 945.

■ We have little trouble concluding that Stoiber's main purpose for using the notes points in the direction of their being securities. All but $50,000 of the $495,000 raised from his customers was used for commodities trading in his personal account. Moreover, in reaffirmation statements signed when they declined Stoiber's rescission offers, the customers acknowledged that they knew at the time of the transactions that most of the money would be used for such trading. We think trading in commodities clearly falls under the "financ[ing] substantial investments" language in *Reves.*

Stoiber predictably disagrees. He argues that he was in the business of selling commodities and that he used the money to purchase inventory which he then attempted to resell at a profit. This he terms a commercial, not an investment purpose. Stoiber's regular business, however, was buying and selling on behalf of his customers; his earnings came not from the difference between the purchase and sale prices of the

---

7. At the outset we reject Stoiber's claim concerning the effect of the initial presumption in *Reves* that a note is a security. He asserts that the mere introduction of some evidence suggesting that a note is not a security is enough to rebut the presumption. The Supreme Court, however, stated that the "presumption may be rebutted only by a showing that the note bears a strong resemblance . . . to one of the enumerated categories of instrument. . . . [or that] another category should be added. . . ." *Reves,* 494 U.S. at 67, 110 S.Ct. 945. Thus, the presumption is only rebutted when the two-step, four-factor analysis based on all the evidence leads to the conclusion that a note is a not a security.

securities he traded but from commissions. Stoiber's trading in commodities was not part of his brokerage business, and so we cannot say that the commodities trading had a commercial purpose related to that business.

But even if we accept the proposition that personal commodities trading was a new business Stoiber planned to operate distinct from his usual brokerage business, use of the note money to buy an inventory of commodities is more akin to "rais[ing] money for the general use of a business enterprise" than the specific commercial uses cited in *Reves* such as remedying a cash flow deficit or purchasing a specific asset. Although the line between commercial and investment uses may not always be sharp, *Reves'* examples appear to distinguish between funding the enterprise generally and funding a discrete component or department of the enterprise. Because the purchase of commodities for reselling was at the core of Stoiber's "business" of trading in them, his use of the money to buy them is appropriately viewed as a general business use.

We also perceive that Stoiber's customers were primarily motivated by the opportunity to earn a profit on their money. The NASD's investigator interviewed the note holders and testified that "the customers were providing the money because they knew Mr. Stoiber fairly well and trusted him and *were interested in receiving a competitive interest rate.*" Transcript at 32 (emphasis added). The rates they received—two points over prime—were described by the SEC, possessed of greater expertise than we, as "favorable." *In re Gerald James Stoiber*, 65 S.E.C. Docket at 1100. And the Supreme Court has said a favorable interest rate indicates that profit was the primary goal of the lender. *See Reves*, 494 U.S. at 67–68, 110 S.Ct. 945 (variable rate designed to stay above rate offered by local financial institutions). The fact that the rates were fixed and not variable does not suggest otherwise. *See Pollack v. Laidlaw Holdings, Inc.*, 27 F.3d 808, 813 (2d Cir.1994) (noting that fixed rate bonds are regulated as securities).

Stoiber argues that the customers provided funds because of the personal relationships he had with them. His evidence includes affidavits submitted by the note holders, which state that "I believe Mr. Stoiber is an honest and successful business person, and I believe him to be a good risk to repay me the loan; that is the reason why I loaned him this money." This display of trust, however, does not speak to the note holders' original motivations in making the loans. Rather, it speaks to the information available to them when deciding whether the notes involved a tolerable level of risk. The only evidence in the record that sheds light on the customers' motivations indicates that profit in the form of interest was their primary goal.

There is also a substantial difference between the goals of the parties in this case and those involved when banks provide character loans or commercial loans for current operations—two types of lending evidenced by notes that are not considered securities under *Reves*, and which Stoiber argues bear a "family resemblance" to his notes. Character loans are generally offered in an attempt to cement or maintain an ongoing commercial relationship with the borrower. A loan for current operations allows the borrower to achieve the commercial goal of continuing to operate a business smoothly during a period when cash inflows and outflows do not match up. These purposes do not characterize the notes here. Unlike with a character loan, the note holders were not trying to satisfy a potential or actual customer. Unlike with a loan for current operations, Stoiber was funding his entire endeavor, not just getting past a cash crunch.

### 2. *The Second* Reves *Factor—Plan of Distribution*

Under the second *Reves* factor, we examine the plan of distribution of a note "to determine whether it is an instrument in which there is common trading for speculation or investment." *Reves*, 494 U.S. at 66, 110 S.Ct. 945 (citation and internal quotation marks omitted). "[T]he requisite 'common trading'" is established if the instrument is "offered and sold to a broad segment of the public...." *Id.* at 68, 110 S.Ct. 945.

This factor points in no clear direction in this case. While the terms of the notes do

not preclude trading in a secondary market, none have been resold and there is no indication that anyone has considered reselling them. Nor do we think thirteen customers with whom Stoiber had a personal relationship constitute "a broad segment of the public."

On the other hand, Stoiber solicited individuals, not sophisticated institutions. While his solicitations included individual presentations, he offered his customers little detail. These facts suggest common trading. *See RTC v. Stone,* 998 F.2d 1534, 1539 (10th Cir.1993); *Banco Espanol de Credito v. Security Pac. Nat'l Bank,* 973 F.2d 51, 55 (2d Cir.1992).

### 3. *The Third* Reves *Factor—Expectations*

The Supreme Court described the third factor as follows:

> Third, we examine the reasonable expectations of the investing public: The Court will consider instruments to be "securities" on the basis of such public expectations, even where an economic analysis of the circumstances of the particular transaction might suggest that the instruments are not "securities" as used in that transaction.

*Reves,* 494 U.S. at 66, 110 S.Ct. 945.

Whether notes are reasonably perceived as securities generally turns on whether they are reasonably viewed by purchasers as investments. *See id.* at 68–69, 110 S.Ct. 945; *Pollack,* 27 F.3d at 814; *SEC v. R.G. Reynolds Enters., Inc.,* 952 F.2d 1125, 1131 (9th Cir.1991). When a note seller calls a note an investment, in the absence of contrary indications "it would be reasonable for a prospective purchaser to take the [offeror] at its word." *Reves,* 494 U.S. at 69, 110 S.Ct. 945. *See also R.G. Reynolds Enters., Inc.,* 952 F.2d at 1131. Conversely, when note purchasers are expressly put on notice that a note is not an investment, it is usually reasonable to conclude that the "investing public" would not expect the notes to be securities. *See Banco Espanol de Credito,* 973 F.2d at 55–56. Here, there is no indication that Stoiber called the notes investments. Although of questionable value due to their conclusory character, affidavits submitted by the customers stated that the notes were not considered to be investments. The limited evidence thus suggests that Stoiber's investing public did not reasonably view the notes as securities.

This admission does not, however, add much to the inquiry into whether the promissory notes are securities. The Supreme Court itself described this factor as a one-way ratchet. *See Reves,* 494 U.S. at 66, 110 S.Ct. 945. It allows notes that would not be deemed securities under a balancing of the other three factors nonetheless to be treated as securities if the public has been led to believe they are. It does not, however, allow notes which under the other factors would be deemed securities to escape the reach of regulatory laws. In this case, then, the third *Reves* factor is basically a wash.

### 4. *The Fourth* Reves *Factor—Need for Federal Securities Laws*

The fourth and final inquiry looks to the adequacy of regulatory schemes other than the federal Securities Acts in reducing risk to the lender. *Reves* indicates that an alternative regulatory scheme, collateral, and insurance are all capable of reducing the risk to note holders sufficiently to render the protection of federal securities laws unnecessary. *See id.* at 69, 110 S.Ct. 945; *see also Stone,* 998 F.2d at 1539 (collateral).

Stoiber argues that "the circumstances of the loans and the creditor/debtor laws of the State of Illinois already provide adequate protection to the lenders." The circumstances he refers to are provisions in the notes for acceleration of payment upon default and recovery of collection costs and attorney fees. We think these are significantly less valuable than collateral or insurance and not by our thinking an adequate substitute for the protection of federal law. Unlike the securities laws, they do not provide any oversight over the initiation of the transactions or Stoiber's handling of the funds. Indeed, part of why the SEC believes that Stoiber's failure to provide his firm notice of the note transactions represents a serious omission is that it denied the note holders the value of oversight by the firm as

to how he used the money and whether he fulfilled the note obligations. Unlike collateral and insurance, acceleration provisions and the like in the notes do not guarantee recovery by the note holders if Stoiber loses everything in his commodities investments or defaults for some other reason.

As for protection afforded by Illinois laws, Stoiber's reliance on them would expand the types of alternative protection cognizable beyond those contemplated in *Reves*.[8] The risk reducing factors described by the *Reves* Court operate to prevent investors from harm in the first place or, like insurance and collateral, make recovery more likely after injury. In explaining the fourth factor, the Court looked to *Marine Bank v. Weaver*, 455 U.S. 551, 557–58, 102 S.Ct. 1220, 71 L.Ed.2d 409 (1982), which involved certificates of deposit that were insured by the FDIC and the subject of substantial federal banking regulations. *See Reves*, 494 U.S. at 67, 69, 110 S.Ct. 945. Similarly, the Second Circuit found an alternative regulatory scheme sufficient when the sale of the notes at issue was governed by guidelines of the Comptroller of the Currency. *See Banco Espanol de Credito*, 973 F.2d at 55–56. The provisions of Illinois law relied on by Stoiber are of a different type; he asserts basically only that state courts are open and that injured note holders can bring lawsuits. Like his "circumstances of the loans," however, this opportunity only operates post-injury and offers much less certainty than collateral and insurance. We do not think Illinois law renders the protection of federal securities law unnecessary in this case.[9]

Comparing Stoiber's notes to character and commercial loans offered by banks also suggests that the protection of federal securities law is not redundant here. We agree with the SEC that bank loans and Stoiber's notes are very different; a bank has the expertise and the access to records needed to carefully assess a person's creditworthiness and financial plans. Stoiber's customers had no such expertise or access. While the long-lasting relationships between Stoiber and his customers did give the note holders personal information about their solicitor not always available to bankers, we do not think this can be an adequate substitute for the objective data and analytical skills possessed by lending institutions. Information and evaluation of friends based on personal relationships is often subject to manipulation and skewed by other facets of the relationships.

### 5. *The* Reves *Factors Viewed Collectively*

Based on the four *Reves* factors, then, we conclude that the promissory notes executed by Stoiber are securities. They do not bear a strong enough resemblance to the categories of notes declared by the Supreme Court to be outside the definition of securities and the four factors do not suggest that these notes should be treated as a new non-security category. Admittedly the plan of distribution in part signals that the notes might not be securities, but that factor by itself is not dispositive. *See Trust Co. of Louisiana v. NNP Inc.*, 104 F.3d 1478, 1489 (5th Cir.1997) ("A debt instrument may be distributed to but one investor, yet still be a security."). The motivations of Stoiber and his customers and the lack of sufficient risk reducing factors other than federal securities laws strongly favor treating the notes as securities, despite the close plan of distribution. The remaining factor—the reasonable expectations of the investing public—is not relevant in this case.

### B. *Whether the SEC Erred in Affirming the NASD's Sanctions*

■ Having determined that the notes are securities to which NASD's Section 40 ap-

---

8. Stoiber explains that the state statute of limitations is longer, that punitive damages are available, and that unlike under federal securities law plaintiffs can sometimes succeed under the Illinois Consumer Fraud Act without demonstrating scienter. *See* Petitioner's Brief at 32. He also explains that the venue and process service provisions of federal law are unnecessary because all of the note holders are Illinois residents and that the federal securities law controlling person liability provisions are unnecessary because Stoi-

ber provided the notes in his individual capacity. *See id.* at 31.

9. We therefore need not reach the open question of whether state law can ever be an adequate substitute under the fourth *Reves* factor. *See Pollack*, 27 F.3d at 815. This question stems from the statement in *Reves* that "the notes here would escape *federal* regulations entirely if the [Securities] Acts were held not to apply." *Reves*, 494 U.S. at 69, 110 S.Ct. 945 (emphasis added).

plied, we consider the appropriateness of the sanctions. Stoiber objects to the suspension, the restitution requirement, and the fine. We review an SEC decision affirming sanctions imposed by the NASD against a broker for an abuse of discretion. *See Svalberg v. SEC,* 876 F.2d 181, 184 (D.C.Cir.1989) (per curiam); *Seaton v. SEC,* 670 F.2d 309, 311 (D.C.Cir.1982) (per curiam).

█ In affirming Stoiber's sanctions, the SEC explained that they fell within the NASD's recommended range for serious conduct that deprived public investors of protection and improperly exposed Stoiber's employer to risk. We note that the SEC has indeed treated this kind of violation seriously on numerous prior occasions. *See, e.g., In re Gilbert M. Hair & Vladimir Chorny,* 51 S.E.C. 374, 378 & n. 10 (1993). Stoiber nonetheless counters with numerous reasons why he should have been accorded less severe sanctions, *i.e.,* whether the notes are securities is a close call, he did not act willfully, he did not try to conceal the notes, he gave his firm oral notice of the loans, the customers were not injured, the customers and his firm did not seek disciplinary action, he has a spotless disciplinary record, and the customers declined rescission.

In *Seaton,* this court affirmed a one year suspension in a similar situation. The broker there sold securities to customers three times without his employer's knowledge and also answered questions falsely on an application to work with another firm. *See Seaton,* 670 F.2d at 310. At that time the NASD Rules of Fair Practice did not include Section 40, but Section 1 had been interpreted to include the written notification requirement for brokers participating in private securities transactions. *See id.; In re William Louis Morgan,* 51 S.E.C. 622, 625 n. 12 (1993). The case did not involve fraud or harm to any investors. *See Seaton,* 670 F.2d at 311. We stated that:

> We will not lightly disturb the findings of an agency in its area of expertise. In this case there is an undisputed pattern of repeated violations, the significance of which the Commission is better equipped to judge than this Court. There is no indica-

tion that the Commission has abused its discretion in affirming the sanctions.

*Id.* In another similar case, the SEC described violations as willful and entered permanent suspensions, even though the brokers involved apparently acted on advice of counsel. *See O'Leary v. SEC,* 424 F.2d 908, 909, 912 (D.C.Cir.1970). The brokers were evidently first offenders and investors did not suffer any injury. *See id.* at 912. We upheld the suspensions, noting that while the mitigating factors " 'might have warranted a lighter sanction, they did not require one.' " *Id.* (quoting *Tager v. SEC,* 344 F.2d 5, 8 (2d Cir.1965)). Additionally, the NASD Sanction Guidelines call for consideration of a suspension of up to two years or, in egregious cases, a permanent bar. *See* NASD Regulation, Inc., *NASD Sanction Guidelines* 15 (1998) ("Guidelines"). In light of *Seaton, O'Leary,* and the *Guidelines,* we cannot say that the six month suspension of Stoiber was an abuse of discretion.

Stoiber contends that the restitution requirement is unjustifiable in light of the uniformly rejected rescission offers he made under his agreement with the state of Illinois. The SEC's concerns are not identical to those of Illinois, however, and Illinois never found Stoiber in violation of state laws or regulations, whereas the SEC found violations of the NASD Rules. A stiffer response from the SEC is thus not surprising. As the notes were at the core of Stoiber's violations, it was not an abuse of discretion for the SEC to require Stoiber to disgorge what he had obtained improperly. *See Hateley v. SEC,* 8 F.3d 653, 656–57 (9th Cir.1993) (ordering disgorgement in amount equal to ill-gotten gain); *see also Guidelines* at 7 n.2 ("restitution is an appropriate method of depriving a respondent of his or her ill-gotten gain").

The SEC makes a convincing case that the size of the fine, $450,000 less restitution made within sixty days, is appropriate under the NASD *Guidelines.* The *Guidelines* call for a fine of $5,000 to $50,000 for violation of the written notification requirement. The SEC correctly asserts that it is entitled to treat Stoiber's actions as thirteen separate violations, one for each note. *See Svalberg,* 876 F.2d at 185. At a maximum $50,000 per

violation, the ceiling goes up to $650,000.[10] The SEC also argues that the *Guidelines* allow the fine to be increased by the amount of money received from the note holders. While the *Guidelines* do allow adjudicators to "add[ ] the amount of a respondent's financial benefit," *Guidelines* at 15 n.2, the benefit to Stoiber here was only the temporary use of the money, not the amount of the notes in full. The SEC does not need this extra fillip since the $5,000 to $50,000 *Guidelines* range for each violation is sufficient to demonstrate that the fine was not excessive. We also note that three of the four "principal considerations" listed in the *Guidelines* with respect to this kind of violation militate in favor of a severe fine: Stoiber was affiliated with the issuer (he was the issuer), he sold the notes to customers of the firm, and he did not provide the firm with "verbal notice of all relevant factors."[11] *Guidelines* at 15. Additionally, although Stoiber argues that the note holders have not suffered any injury, the *Guidelines* state that "[a]djudicators should not consider whether the investment or enterprise was successful." *Id.* at 15 n. 1. We conclude then that the SEC did not abuse its discretion in affirming the fine imposed by the NASD.

## C. *Whether the Fine Violates the Eighth Amendment*

■ Stoiber also argues that the fine violates the Eighth Amendment's Excessive Fines Clause[12] because it is not proportional to his misconduct. We consider this argument waived because Stoiber failed to raise it before the SEC as required by statute:

No objection to an order or rule of the Commission, for which review is sought under this section, may be considered by the court unless it was urged before the Commission or there was reasonable ground for failure to do so.

15 U.S.C. § 78y(c)(1). This requirement is not inapplicable solely because the objection not urged before the SEC is a constitutional one. *See C.E. Carlson, Inc. v. SEC*, 859 F.2d 1429, 1439 (10th Cir.1988).

■ The failure to raise an issue in a prior forum is excusable when due to an intervening change in the law, *see Association of Bituminous Contractors, Inc. v. Apfel*, 156 F.3d 1246, 1254 n. 5 (D.C.Cir.1998); *Roosevelt v. E.I. Du Pont de Nemours & Co.*, 958 F.2d 416, 419 & n. 5 (D.C.Cir.1992), but no such exception is applicable here. Stoiber contends that *United States v. Bajakajian*, — U.S. ——, 118 S.Ct. 2028, 141 L.Ed.2d 314 (1998), decided after the SEC affirmed the NASD in his case, "is a landmark decision that breathed new life into Eighth Amendment jurisprudence." Although *Bajakajian* did reject a fine because of a lack of proportionality with the offense, it certainly was not the source of any new or novel proportionality requirement. *See Pharaon v. Board of Governors of Fed. Reserve Sys.*, 135 F.3d 148, 156 (D.C.Cir.), *cert. denied*, —— U.S. ——, 119 S.Ct. 371, 142 L.Ed.2d 307 (1998) (stating, months before *Bajakajian* was decided, that the "Clause requires us to consider the value of the fine in relation to the offense"). *Bajakajian* did not elevate Stoiber's Excessive Fines claim "from completely untenable to plausible." *United States v. Byers*, 740 F.2d 1104, 1116 n. 11 (D.C.Cir.1984) (en banc). Stoiber's objection to the fine on other grounds before the agency was not sufficient to avert waiver on this one.

## III. CONCLUSION

Because the SEC correctly determined that the promissory notes are securities, the sanctions do not constitute an abuse of discretion, and Stoiber waived his Eighth

---

**10.** Even if we considered only the eleven violations that occurred within the time frame initially listed in the complaint, *see supra* note 1, the ceiling would still be greater than the fine imposed.

**11.** The SEC observed that Stoiber only "spoke [with the compliance director] generically about obtaining loans." *In re Gerald James Stoiber*, 65 S.E.C. Docket at 1101 n.23.

**12.** "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."

Amendment claim, the petition for review is denied.

*So ordered.*