**Robin Bruce McNABB, Petitioner,**

v.

**SECURITIES AND EXCHANGE COMMISSION, Respondent.**

No. 00–71528.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 15, 2002.

Filed Aug. 12, 2002.

Thomas B. Kidwell, San Jose, CA, for the petitioner.

Nathan A. Forrester, Senior Counsel, and Randall W. Quinn, Assistant General Counsel, Securities and Exchange Commission, Washington, DC, for the respondent.

Before: REINHARDT, MAGILL,* and FISHER, Circuit Judges.

* Honorable Frank Magill, Senior United States Circuit Judge for the Eighth Circuit, sitting by

## OPINION

MAGILL, Circuit Judge.

This case involves two issues arising out of a disciplinary proceeding brought by the National Association of Securities Dealers, Inc. (the "NASD") against appellant, Robin Bruce McNabb. First, McNabb appeals the Securities and Exchange Commission's (the "Commission") final order, issued October 4, 2000, which found that certain promissory notes were securities under section 3(a)(10) of the Securities and Exchange Act of 1934 (the "1934 Act"). *See* 15 U.S.C. § 78c(a)(10) (1994). Second, McNabb appeals the Commission's decision to sustain the sanctions imposed upon him by the NASD: a censure, a lifetime bar from association with any NASD member firm, and a fine of $50,000. We affirm.

**I**

From February 1990 until December 7, 1995, McNabb was employed by American Investors Company ("AIC"), a broker-dealer firm and member of the NASD. During this time, McNabb managed the AIC Office of Supervisory Jurisdiction in San Jose, California. He operated the office as an independent contractor under the name RKM Financial Group ("RKM"). At the time of his employ, McNabb also held a real estate broker's license and provided tax and accounting services to his clients.

Between February 1994 and May 1995, McNabb borrowed approximately $690,000 from six customers in exchange for ten promissory notes. The notes had fixed rates of interest ranging from eleven to seventeen percent, interest was to be paid monthly, and payment of the principal was due on or before specific dates, which ranged from seventeen months to approximately six years. One of the notes was secured by a deed of trust on the RKM office suite. McNabb never informed AIC that he had issued these promissory notes.

All of the customers to whom McNabb sold the notes were long-time clients. McNabb's proffered reason for asking his clients for the loans was that he needed money to reorganize his business operations, primarily due to his own personal financial problems arising from the pending dissolution of his marriage. The transactions are as follows: five unsecured notes to Peter Damsgaard and Lee Von Fossen totaling $237,500; one deed of trust in the amount of $110,250 to Donald Lewis; one unsecured note in the amount of $60,000 to George Forrester; two unsecured notes totaling $75,000 to Harold and Marie Schnackel; and one unsecured note for $209,500 to Lois Meyers. All of the money from these loans was used by McNabb for general business overhead expenses.

In late 1995, AIC initiated an internal investigation of these transactions after an earlier, and altogether separate, inquiry brought these transactions to AIC's attention. During the course of the investigation, McNabb made false and misleading statements to AIC. As a result of the investigation, McNabb's association with AIC was terminated, in part on the grounds that he had violated the firm's policy against accepting loans from customers. Consequently, AIC reported the incident to the NASD.[1]

designation.

1. On June 27, 1997, the District Business Conduct Committee for District No. 1 (the "DBCC") filed a complaint against McNabb. Two hearings were held before the subcommittee of the DBCC on March 4 and April 30, 1998. At these hearings, the DBCC received testimony and numerous exhibits. On July 24, 1998, the DBCC issued its decision and the National Adjudicatory Council of the NASD reviewed the decision at a hearing on November 23, 1998. It is this final decision that is discussed in the main text.

The NASD found that McNabb had violated three NASD Conduct Rules. First, McNabb violated both Rule 2110 [2] and Rule 3040(b) [3] when he failed to inform AIC about his sale of securities, in the form of promissory notes and equipment leases, to six of his clients. Next, the NASD found that McNabb also violated Rule 2310 [4] because, with respect to three clients, he did not have reasonable grounds for believing that the investments were financially suitable for them. Accordingly, the NASD censured McNabb, fined him $50,000 ($25,000 for the "selling-away" violations and $25,000 for the "suitability" violations), and barred him from future association with any NASD member.

After the NASD rendered its decision, McNabb petitioned the Commissioner for review of the adverse decision. On October 4, 2000, after an independent review of the record, the Commission issued an order rejecting McNabb's contention that the promissory notes that he admittedly sold to his clients were not securities. Consequently, the Commission found that McNabb had violated the aforementioned NASD Conduct Rules because he failed to notify AIC of the sales and that he made unsuitable recommendations with respect to certain clients.

Next, the Commission addressed the issue of sanctions imposed by NASD on McNabb. In doing so, the Commission noted the importance of both the NASD's "selling-away" and "suitability" regulations as a means of protecting both investors and brokerage firms. The Commission then concluded that the sanctions imposed against McNabb were not "excessive or oppressive," nor did they impose "an unnecessary or inappropriate burden on competition," and therefore did not violate section 19(e)(2) of the 1934 Act. Finally, the Commission noted that the two fines of $25,000 were within the applicable range recommended by the NASD's Sanction Guidelines for the violations that occurred. In accordance with these observations, the Commission sustained the NASD's impositions of sanctions against McNabb.

## II.

 First, McNabb argues that the Commission erred in determining that the promissory notes he sold to his clients in return for approximately $690,000 are properly classified as securities under the 1934 Act as interpreted by the Supreme Court's decision in *Reves v. Ernst & Young*, 494 U.S. 56, 110 S.Ct. 945, 108 L.Ed.2d 47 (1990). Whether a note is a security under the 1934 Act is a question of law, which we review de novo. *Stoiber v. SEC*, 161 F.3d 745, 749 (D.C.Cir.1998). With respect to factual findings, this court must uphold the Commission's findings if they are supported by substantial evidence. 15 U.S.C. § 78y(a)(4) (1994).

 Under the 1934 Act, the definition of "security" in section 3(a)(10) includes

2. Rule 2110 generally provides: "[That an NASD] member, in the conduct of his business, shall observe high standards of commercial honor and just and equitable principles of trade."

3. Rule 3040(b), the "selling-away" regulation, provides that persons associated with a NASD member "shall provide written notice to the member with which he is associated describing in detail the proposed transaction and the person's proposed role therein and stating whether he has received or may receive selling compensation in connection with" any transaction made outside the regular course of employment.

4. Rule 2310, the "suitability" regulation, provides that when "recommending to a customer the purchase, sale or exchange of any security, a member shall have reasonable grounds for believing that the recommendation is [financially] suitable" for the customer in question.

numerous financial instruments, beginning with "any note." Despite the plain language of the 1934 Act, the Court has eschewed interpreting the 1934 Act to encompass the literal meaning of the phrase "any note." Instead, "the phrase 'any note' should not be interpreted to mean literally 'any note,' but must be understood against the backdrop of what Congress was attempting to accomplish in enacting the Securities Acts." *Reves,* 494 U.S. at 63, 110 S.Ct. 945. Congress's purpose in creating the 1934 Act "was to regulate *investments,* in whatever form they are made and by whatever name they are called." *Id.* at 61, 110 S.Ct. 945. Thus, we look to whether the notes in question resemble an investment.

■■■ Under *Reves,* the analysis begins with a rebuttable presumption that a note is a security within the meaning of the 1934 Act unless it falls into certain judicially created categories of financial instruments that obviously are not securities or if the note in question bears a "family resemblance" to notes in those categories. *Id.* at 65, 110 S.Ct. 945; *see also SEC v. R.G. Reynolds Enters., Inc.,* 952 F.2d 1125, 1131 (9th Cir.1991). In applying the "family resemblance" test, we must look to four factors: (1) the motivations that would prompt a reasonable buyer and seller to enter into the transaction in question; (2) the plan of distribution of the instrument; (3) the reasonable expectations of the investing public; and (4) whether the existence of an alternate regulatory scheme significantly reduces the risk of the instrument. *Reves,* 494 U.S. at 66–67, 110 S.Ct. 945; *see also R.G. Reynolds,* 952 F.2d at 1131.

■■■ McNabb argues that the evidence establishes that the notes in question bear a sufficient enough "family resemblance" with either a bank "character" loan or a commercial loan for current operation so as to fall outside the purview of

the 1934 Act. *See Reves,* 494 U.S. at 65, 110 S.Ct. 945 (enumerating various financial instruments and noting that neither character nor commercial loans are considered securities within the meaning of the 1934 Act) (citations omitted). Generally speaking, character loans are loans that a bank makes to "cement or maintain an ongoing commercial relationship with the borrower," while commercial loans for current operations are made to allow a borrower to continue "to operate a business smoothly during a period when cash inflows and outflows do not match up." *Stoiber,* 161 F.3d at 750. To overcome the presumption, the notes in question must bear a " 'strong resemblance' to one of the enumerated types of notes." *Id.* at 749 (quoting *Reves,* 494 U.S. at 67, 110 S.Ct. 945).

After a thorough review, we conclude that the promissory notes in question do not strongly resemble either a bank character loan or a commercial loan to maintain business operations.

■■■ This does not, however, end our inquiry. As the Court noted in *Reves,* if no such "strong resemblance" is found, we must then decide whether, as a matter of law, to add an additional category of financial instruments to the list of non-securities, utilizing the same four factors. 494 U.S. at 67, 110 S.Ct. 945. For the following reasons, we decline to do so.

■■■ [3] Under the first *Reves* factor, a note is likely to be a security "[i]f the seller's purpose is to raise money for the general use of a business enterprise or to finance substantial investments and the buyer is interested primarily in the profit the note is expected to generate." *Id.* at 66, 110 S.Ct. 945. Alternatively, a promissory note that "is exchanged to facilitate the purchase and sale of a minor asset or consumer good, to correct for the seller's cash-flow difficulties, or to advance some other commercial or consumer purpose"

will "less sensibly [be] described as a 'security.' " *Id.* This inquiry is an objective one, and the court must look to "the motivations that would prompt a reasonable seller and buyer to enter into[the transaction.]" *Id.*

First, it is undisputed that McNabb used the money he received from the sale of the notes in order to raise funds for use in his business, RKM. The Commission's finding that the promissory notes were not sold to correct cash-flow difficulties within the meaning of *Reves* is supported by substantial evidence and should not be disturbed.

 The second *Reves* factor requires the court to examine the plan of distribution of the note to determine whether the note "is an instrument in which there is common trading for speculation or investment." *Id.* (citations and internal quotation marks omitted). If notes are sold to a broad segment of the public, then "common trading" is established. *Id.* at 68, 110 S.Ct. 945. McNabb argues that in the present case only ten notes were issued to six individuals and therefore the notes were not issued as part of a general public offering. To be sure, six customers in total does not constitute "a broad segment of the public," *Stoiber,* 161 F.3d at 751 (thirteen customers not considered to be "a broad segment of the public"), but this fact alone is not dispositive. Instead it must be weighed against the purchasing individual's need for the protection of the securities laws. Here, McNabb sold the promissory notes to six individuals, not sophisticated financial institutions. *See id.; see also Resolution Trust Corp. v. Stone,* 998 F.2d 1534, 1539 (10th Cir.1993) (notes sold to sophisticated market led to conclusion that no common trading occurred). Thus, the protection provided by the Securities Acts would benefit the individual investors in this case. Viewing these two facts, it appears this factor does not support either McNabb's

or the Commission's position. *See Stoiber,* 161 F.3d at 751.

 Third, we must determine whether the promissory notes in question are reasonably perceived by the investing public as securities. In doing so, we must consider whether a reasonable member of the investing public would consider these notes as investments, "even where an economic analysis of the circumstances of the particular transaction might suggest that the instruments are not 'securities' as used in that transaction." *Reves,* 494 U.S. at 66, 110 S.Ct. 945; *see Stoiber,* 161 F.3d at 751 (describing this factor as a "one-way ratchet"). McNabb argues that the declarations of three of the individuals who purchased the notes suggest that they did not view the notes as securities, but rather as a means of effectuating a loan. The opinions of these individuals under this factor are irrelevant. As the court in *Stoiber* correctly noted, such admissions add little, if anything, to the "inquiry into whether the promissory notes are securities." 161 F.3d at 751. The court must look to a reasonable investor, not the specific individuals in question. Because in our view the Commission's conclusion that a reasonable investor would view these promissory notes as an investment was correct, this factor cuts in favor of finding that the promissory notes at issue are securities.

Finally, we must assess whether there are adequate risk-reducing factors such as an alternate regulatory scheme that would "significantly reduce[ ] the risk of the instrument" to the lender, "thereby rendering application of the Securities Acts unnecessary." *Reves,* 494 U.S. at 67, 110 S.Ct. 945 (citations omitted). Candidly, McNabb concedes that no such risk-reducing factors exist. Thus, this factor weighs in favor of finding that the promissory notes at issue in this case were actually securities because without such a classifi-

cation there is the potential that the lender may be left open to significant risk.

In light of this analysis, we decline McNabb's invitation to add the notes in question to the list of non-securities. Accordingly, the Commission's finding that the promissory notes in this case were securities, and that the sale of the notes, without prior notice to his employer, violated NASD Conduct Rules is affirmed.

### III.

 McNabb's final contention is that the sanctions imposed by the NASD "are grossly disproportionate to the alleged harm done to any participant." Review of the Commission's affirmance of the NASD's imposition of sanctions is for an abuse of discretion. *Alderman v. SEC,* 104 F.3d 285, 288 (9th Cir.1997). Primarily, McNabb argues that because none of his clients were adversely affected, financially speaking, nor were any of his clients' trust betrayed by the transactions, the sanctions imposed upon him are unwarranted. This argument, however, must fail because, as noted above, the decision to uphold sanctions is committed to the discretion of the Commission, and, in fact, the Commission may not overturn NASD imposed sanctions unless it finds the sanctions to be "excessive or oppressive" or if they impose an unnecessary or inappropriate burden on competition. 15 U.S.C. § 78s(e)(2) (1994); *cf. Seaton v. SEC,* 670 F.2d 309, 311 (D.C.Cir.1982) (per curiam). Despite McNabb's contentions, numerous factors point to upholding the sanctions imposed.

First, by selling $690,000 worth of securities to various clients without notifying his employer, McNabb placed AIC at great risk should any liability issues arise. Not only had McNabb attended compliance meetings required by his employer on this score and signed forms stating that he had not engaged in such practices, but

he also conducted these transactions for his own personal, financial benefit. Furthermore, when first asked about these transactions, McNabb attempted to conceal them from his employer. *Seaton,* 670 F.2d at 311. Second, the Commission found that "three of the sales of promissory notes involved unsuitable recommendations," thus, placing his clients at risk and putting his own interests before those of his clients. On the record before this court, those findings are supported by substantial evidence. Finally, as the Commission noted, the sanctions imposed fall within the NASD's Sanction Guidelines range for similar infractions of NASD Conduct Rules. *See Alderman,* 104 F.3d at 289 (finding no abuse of discretion when sanctions imposed fell within the Guidelines). In light of these facts, and the deferential standard of review applicable to the SEC's approval of NASD-imposed sanctions, we are compelled to conclude that the Commission did not abuse its discretion by finding that the fines imposed by the NASD were neither "excessive or oppressive." Accordingly, we affirm the Commission's Order upholding the sanctions imposed against McNabb.

**AFFIRMED.**

Opinion by Judge MAGILL; Dissent by Judge FISHER.

FISHER, Circuit Judge, Dissenting:

I respectfully dissent from the decision insofar as it affirms the NASD's lifetime bar of McNabb from association with any NASD member firm. According to the "General Principles Applicable to All Sanction Determinations," "[t]he concept of progressive discipline applies to NASD disciplinary proceedings." Yet a lifetime bar is the most serious punishment available, to be imposed upon a repeat offender or one whose misconduct is particularly egregious. There was no evidence that McNabb had a history of misconduct, and

his misconduct in this case was not so egregious as to warrant departure from the progressive scheme. Further, it is not clear that his misconduct caused any tangible harm—his customers' affidavits establish that he is repaying their money and they bear him no ill will. Under these circumstances, although I certainly do not condone McNabb's conduct, I cannot agree that the abuse of discretion standard requires us to affirm such a severe penalty.