### SECURITIES AND EXCHANGE COMMISSION, Plaintiff– Appellee,

v.

### J.T. WALLENBROCK and Associates; Larry Toshio Osaki; Van Y. Ichscinotsubo; Citadel Capital Management Group, Inc., Defendants–Appellants.

#### No. 02–55481.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 11, 2002.

Filed Dec. 12, 2002.

---

24. *See* 29 U.S.C. §§ 211, 626.; 29 C.F.R. § 1626.15(a) & (b).

25. *Gilchrist,* 803 F.2d at 1500.

---

Robert C. Rosen, John B. Wallace, and Dave Lenny, Rosen & Associates, Los Angeles, CA, for the appellants.

Giovanni P. Prezioso, Meyer Eisenberg, Jacob H. Stillman, and Mark Pennington, Securities and Exchange Commission, Washington, DC, for the appellee.

Before: GOODWIN, RYMER, and McKEOWN, Circuit Judges.

McKEOWN, Circuit Judge.

At issue in this interlocutory appeal is whether promissory notes purportedly secured by accounts receivable of Malaysian latex glove manufacturers constitute securities under the Securities Act of 1933, 15 U.S.C. § 77b(a)(1), and the Securities Exchange Act of 1934, 15 U.S.C. § 78c(a)(10) (collectively the "Securities Acts"). The Securities and Exchange Commission ("SEC") characterizes the notes as securities and part of a get-rich-quick Ponzi scheme, while the investment firm claims the notes are legitimate short-term loans that are exempt from the securities laws. Applying *Reves v. Ernst & Young*, 494 U.S. 56, 110 S.Ct. 945, 108 L.Ed.2d 47 (1990), we conclude that the notes are securities regulated by the Securities Acts.

### BACKGROUND

In January of 2002, the SEC filed a civil enforcement action against J.T. Wallenbrock & Associates ("Wallenbrock"), along with its managing general partner, Larry Toshio Osaki, its employee, Van Y. Ichscinotsubo, and Citadel Capital Management Group, Inc. ("Citadel") (collectively "Wallenbrock"), to enjoin a fraudulent scheme to sell unregistered securities.

Although Wallenbrock's story changed over time, the salient points of the plan are as follows: From at least 1999 through January 2002, Wallenbrock sold promissory notes ostensibly secured by the accounts receivable of Malaysian latex glove manufacturers. According to the investment materials, the glove manufacturers typically had to wait eighty to ninety days after shipment to collect from the American buyers, during which time the manufacturers might lose up to 10% of their money due to exchange rate fluctuations. Wallenbrock would step in to fill that gap: when the manufacturer met with the buyer upon delivery and the buyer accepted the shipment, the buyer's future payment was assigned to Wallenbrock, who would then buy the account receivable for 75–80% of its value. Wallenbrock would carry the receivable until it received payment from the buyer, usually around ninety days after delivery. This arrangement seemed profitable for all parties involved—the manufacturers were willing to give a discounted rate in order to get cash immediately upon delivery, the buyers were able to delay their payments for eighty to ninety days, and Wallenbrock would make a quick profit by paying a discounted rate up front, using the influx of cash from the investors, and collecting the full amount from the buyers ninety days later.

Under this plan, the individual investor[1] and Wallenbrock would split the cost of the receivable, with each party owning a 50% undivided secured interest in the account receivable. The notes had a three-month maturity period with a guaranteed twenty percent return during that period. Over the course of several years, Wallenbrock sold more than $170 million worth of notes to over 1,000 investors in at least twenty-five states.

After an investigation, the SEC sought injunctive relief, alleging that Wallenbrock violated the registration requirements of the 1933 Act and general antifraud provisions of the Securities Acts.[2] Wallenbrock acknowledged that it had misrepresented its role in the accounts receivables business, and explained that instead of buying the accounts directly, it actually funneled money into a checking account and then to an offshore trust, which purchased the accounts. Wallenbrock consented to three orders: (1) a temporary restraining order enjoining future violations, pending a hearing on a preliminary injunction; (2) an order prohibiting the alteration of documents and permitting expedited discovery; and (3) an asset freeze.

Subsequent discovery revealed that Wallenbrock's no-risk investment opportunity was in fact a high-stakes pyramid scheme. The millions of dollars flowing through the bank account went, not to an offshore trust, as Wallenbrock claimed, but to pay off earlier investors and to finance risky start-up companies. The district court therefore granted the SEC's request for the appointment of a receiver. In this interlocutory appeal under 28 U.S.C. § 1292(a)(2), Wallenbrock challenges the imposition—though not the merits—of the temporary orders and the appointment of the receiver, claiming that the district court lacked subject matter jurisdiction because the notes are not securities.

## DISCUSSION

The sole issue on appeal is whether the notes are "securities." Although Wallenbrock frames the issue as one of the district court's subject matter jurisdiction, because the question of whether "the case involved a security was itself a federal question," *El Khadem v. Equity Sec. Corp.*, 494 F.2d 1224, 1225 n. 1 (9th Cir. 1974), the district court had subject matter jurisdiction under 28 U.S.C. § 1331. Thus, Wallenbrock's real contention is that the injunction should not have been issued because the notes were not securities. We review these interlocutory orders for an abuse of discretion. *Johnson v. Special Educ. Hearing Office*, 287 F.3d 1176, 1179 (9th Cir.2002). Because this appeal rests on the legal question of the definition of a security, an error in that determination would necessarily constitute an abuse of discretion. *Id.*

The 1934 Act begins with the open-ended language that "[t]he term 'security' means any note." 15 U.S.C. § 78c(a)(10). The presumption that a promissory note is a security, however, is rebuttable. *Reves*, 494 U.S. at 65, 110 S.Ct. 945. Because "Congress was concerned with regulating the investment market, not with creating a general federal cause of action for fraud," *id.*, we analyze whether the note is actually a type that Congress intended to regulate.

Under *Reves*, we inquire first whether the promissory note bears a "fam-

1. The SEC refers to the participants as investors, while Wallenbrock calls them lenders. Consistent with our conclusion that the notes constituted securities, we use the term "investor" throughout.

2. 15 U.S.C. §§ 77e(a), 77e(c), and 77q(a) (1933 Act); 15 U.S.C. § 78j(b) (1934 Act); and 17 C.F.R. § 240.10b–5.

ily resemblance" to a judicially-created list of non-security instruments. *Id.* at 65, 67 (citing *Exchange Nat'l Bank of Chicago v. Touche Ross & Co.*, 544 F.2d 1126, 1138 (2d Cir.1976)). If so, then the note is not a security.[3] *Reves,* 494 U.S. at 67, 110 S.Ct. 945. If the note does not strongly resemble one of the enumerated exceptions, we then determine whether the note is a type that should be added to the list. *Id.* Although courts have treated this analysis as two separate steps, both inquiries involve the application of the same four-factor test, and so the two essentially collapse into a single inquiry.[4] Although the multi-factor test was originally conceived as a method of ascertaining whether an instrument resembles a *non*-security, the Supreme Court has since framed it as an analysis of "whether an instrument denominated a 'note' is a 'security,'" *id.*, and we follow the same convention. *See also id.* at 65–66 ("It is impossible to make any meaningful inquiry into whether an instrument bears a 'resemblance' to one of the instruments identified by the Second Circuit without specifying what it is about *those* instruments that makes *them* non-'securities.'").

■ We structure our inquiry, then, on an examination of the four *Reves* factors: (1) the "motivations that would prompt a reasonable seller and buyer to enter into" the transaction; (2) the "plan of distribution" of the instrument; (3) the "reasonable expectations of the investing public"; and (4) "whether some factor such as the existence of another regulatory scheme significantly reduces the risk of the instrument." *Id.* at 66–67, 110 S.Ct. 945. Failure to satisfy one of the factors is not dispositive; they are considered as a whole. *See, e.g., McNabb v. S.E.C.*, 298 F.3d 1126, 1132–33 (9th Cir.2002) (holding that, although the third factor supported neither side's position, the notes in question nevertheless constituted securities).

■ Based on the *Reves* factors, we conclude that the promissory notes do not bear a sufficiently strong family resemblance to the judicially-created list of non-securities, nor do they warrant addition of a new category to the list. We must also assess whether Wallenbrock's notes fall within the Securities Acts' exception for notes with a maturity period of less than nine months. *See* 15 U.S.C. §§ 77c(a)(3), 78c(a)(10) ("The term 'security' ... shall not include ... any note ... which has a maturity at the time of issuance of not exceeding nine months...."). Because the notes are not of the nature contemplated by the exception, the nine-month safe harbor does not apply and the notes are regulated by the Securities Acts.

### I.  APPLICATION OF THE *REVES* FACTORS

Although the notes may superficially resemble one of the listed exceptions—"short-term notes secured by an assignment of accounts receivable," *Exchange*

---

**3.** The list includes "the note delivered in consumer financing, the note secured by a mortgage on a home, the short-term note secured by a lien on a small business or some of its assets, the note evidencing a 'character' loan to a bank customer, short-term notes secured by an assignment of accounts receivable, or a note which simply formalizes an open-account debt incurred in the ordinary course of business (particularly if, as in the case of the customer of a broker, it is collateralized)." *Exchange Nat'l Bank,* 544 F.2d at 1138.

**4.** *McNabb v. S.E.C.*, 298 F.3d 1126 (9th Cir. 2002) (separating out the two inquiries analytically but combining them in practice); *Pollack v. Laidlaw Holdings, Inc.*, 27 F.3d 808, 811–12 (2d Cir.1994) ("In applying [the family resemblance] test, we look to four factors. If the note is not sufficiently similar to one of the non-security instruments, then we must determine whether another category of such instruments should be judicially created by reference to the same four factors....").

*Nat'l Bank,* 544 F.2d at 1138—that similarity is not the end of our analysis, as Wallenbrock urges, but the beginning. Wallenbrock argues that we should adopt a literal approach: because the notes are ostensibly secured by accounts receivable, they are exactly like the category of notes excluded from the definition of a security. In examining the notes, however, we look to the "economic realities" of the transaction. *Reves,* 494 U.S. at 62, 110 S.Ct. 945. It is not the moniker or label that is dispositive, but the economic characteristics of the notes. *See id.*

### A. MOTIVATION FOR TRANSACTION

■■ The first factor is an objective inquiry into "the motivations that would prompt a reasonable seller and buyer to enter into [the transaction]." *McNabb,* 298 F.3d at 1132 (quoting *Reves,* 494 U.S. at 66, 110 S.Ct. 945). A note is more akin to a security "[i]f the seller's purpose is to raise money for the general use of a business enterprise or to finance substantial investments and the buyer is interested primarily in the profit the note is expected to generate." *Reves,* 494 U.S. at 66, 110 S.Ct. 945; *see also Pollack v. Laidlaw Holdings, Inc.,* 27 F.3d 808, 812 (2d Cir. 1994) ("The inquiry is whether the motivations are investment (suggesting a security) or commercial or consumer (suggesting a non-security)."). By contrast, "[i]f the note is exchanged to facilitate the purchase and sale of a minor asset or consumer good, to correct for the seller's cash-flow difficulties, or to advance some other commercial or consumer purpose ... the note is less sensibly described as a 'security.'" *Reves,* 494 U.S. at 66, 110 S.Ct. 945.

■ The first factor puts the Wallenbrock instruments comfortably into the category of a security. At the core of this transaction, the investors, seeking to make a significant profit, provided Wallenbrock with cash for its business of buying accounts receivable. The notes can hardly be categorized as stop-gap measures to correct for cash-flow difficulties, loans to facilitate the purchase of minor assets, or notes grounded in a traditional commercial purpose. Particularly in light of revelations that the cash infusions kept afloat Wallenbrock's purchases of high-risk start-up companies, it is evident that the notes were used to finance substantial investments. Notably, because Wallenbrock did not give the investors any specific information about the accounts receivable or provide documentation as to their secured interest, few reasonable buyers would think that the investments were for anything other than the "general use of a business enterprise." *Reves,* 494 U.S. at 66, 110 S.Ct. 945.

Finally, the scheme encouraged participants to view their commitment as a long-term investment. For example, investors were required to request distribution of principal and interest four weeks before the maturity date on a three-month note, and any later request would result in a fee. The automatic rollover of the notes from month to month also suggests that the defendants intended to use the investors' money for long-term financing. The fact that Wallenbrock's promised interest rate was stable rather than "constantly revised to keep it slightly above the rate paid by local banks," as was true of the security in *Reves,* 494 U.S. at 68, 110 S.Ct. 945, is not sufficient to make the notes a non-security. Indeed, the promise of a high, stable 20% interest rate likely attracted investors looking for significant profits. The decision of many investors to put their notes into Individual Retirement Accounts ("IRAs")—a strategy encouraged by Wallenbrock's offer of a custodian list and IRA information—is a further indication that the participants intended these to be long-

term investments rather than short-term notes. The nature of the transactions therefore suggests that a reasonable buyer and seller would have viewed the transactions as investments and the notes as securities.

### B. OFFER AND SALE TO A BROAD SEGMENT OF THE PUBLIC

■ The second factor is whether the notes were "offered and sold to a broad segment of the public." *Id.* at 68, 110 S.Ct. 945. The notes here were held by over 1,000 investors in at least twenty-five states. Although Wallenbrock claims that it did not engage in a marketing scheme, Wallenbrock put no limitations on who could purchase the notes, offering them to any member of the general public who would make the investment and provide his name, address, and social security number. Despite investment materials claiming that the company "does not pay finder's or referral fees to those who recommend others for participation in the program," a letter sent to prospective investors in January of 2001 advertised a onetime finder's fee of 1.5% for successful referrals. The broad availability of the notes, plus Wallenbrock's evident interest in widening the scope of distribution, tips this factor strongly in favor of classifying the note as a security.

### C. REASONABLE INVESTOR INQUIRY

Under the third *Reves* factor, we determine "whether a reasonable member of the investing public would consider these notes as investments." *McNabb*, 298 F.3d at 1132. Our benchmark is what a "reasonable investor" would think, not what the "specific individuals in question" might have thought. *Id.*

■ This factor is closely related to the first factor—motivation for the transaction—and thus the considerations discussed vis-a-vis that factor also come into play here. We conclude that this factor easily tips in favor of categorizing the notes as securities. A reasonable investor sending funds to Wallenbrock for a guaranteed return of 20% and an automatic rollover every three months would expect that the funds were an investment, not a short-term loan. The fact that Wallenbrock did not use the term "investment" to describe the notes is of little import, given the nature of the transactions.

### D. RISK-REDUCING FACTORS

Finally, we must ascertain whether any risk-reducing factors indicate that the notes "are not in fact securities." *Reves*, 494 U.S. at 69, 110 S.Ct. 945. Wallenbrock advances several rationales for not subjecting the notes to regulation under the Securities Acts: the collateralization of the notes, the fixed interest rate, the short length of the loan term, and the availability of other regulation. But none of these justifications is persuasive.

■ For obvious reasons, collateralization would help mitigate the risk of the loan. Conversely, the absence of collateralization increases the risk of a loan because, in case of default, the lender or investor often has limited recourse to recoup the investment. *See id.* (holding that risk of demand notes was not reduced in part because notes were uncollateralized). But here the so-called collateralization appears to be a fiction. The SEC's investigation revealed that Wallenbrock itself did not purchase or own any receivables. The offshore trust, if it existed at all, had no documentation regarding its purchase of the receivables, no bank statements, and no method of confirming the trust's assets. The claim that any receivables existed at all, therefore, is highly suspect—and even if they did, the investors had no way of reaching the assets. Although each inves-

tor ostensibly had a 50% interest in the specific account or accounts in which they invested, the nature of the plan as a pyramid scheme meant that had a large number of investors wanted to cash out their notes at once, some inevitably would have been left out in the cold.

Nor did the fixed nature of the interest rate act as a riskreducing factor because the interest was coming from other investors' money. As long as only a limited number of investors sought to collect interest, that high return was guaranteed; but as soon as a critical mass wanted out, the whole pyramid threatened to collapse. Even a variable rate of interest would have been far safer if the interest were actually tied to some independent profit-producing project, which this scheme was not.

Moreover, labeling the notes as short-term, as Wallenbrock sought to do, is misleading. Investors were encouraged to roll over their notes, the roll-over was automatic, and restrictions on cashing out were strict. The notes tended, therefore, to become long-term investments, a practice Wallenbrock encouraged to further its scheme. The notes were also highly illiquid, even in their short-term state, because their cash value was accessible only at limited times. The lack of liquidity contributed to both the risk and longevity of the notes. *Id.*

■ Finally, the existence of limited alternative regulatory enforcement mechanisms does not obviate the need for the protection of the Securities Acts. "In defining the scope of the market that it wished to regulate, Congress painted with a broad brush.... [I]t enacted a definition of security sufficiently broad to encompass virtually any instrument that might be sold as an investment." *Id.* at 60–61, 110 S.Ct.

945 (citations and internal quotation marks omitted). An alternative regulatory regime would therefore need to be quite comprehensive—such as federal banking regulations, *Marine Bank v. Weaver,* 455 U.S. 551, 557–58, 102 S.Ct. 1220, 71 L.Ed.2d 409 (1982), or federal protection of retirement benefits (the Employee Retirement Income Security Act), *Teamsters v. Daniel,* 439 U.S. 551, 569–70, 99 S.Ct. 790, 58 L.Ed.2d 808 (1979)—to keep the notes from "escap[ing] federal regulation entirely." *Reves,* 494 U.S. at 69, 110 S.Ct. 945. As Wallenbrock points out, the California Department of Corporations did exercise some regulatory power over the notes, issuing a Desist and Refrain Order to prevent Wallenbrock from continuing to offer them. But that remedy offers little solace to existing investors. And a patch-work of state regulation, which applies to most business entities in some fashion or another, cannot displace the federal regime. Congress endorsed comprehensive nationwide securities regulation; the fact that a company is subject to regulation by a single state is not nearly enough to remove the company from the umbrella of the federal securities laws.

Considering the *Reves* factors and the economic realities of the Wallenbrock notes, we conclude that the notes are securities. They do not bear the characteristics of non-security instruments, and because the indicia of an investment are so strong, we decline to add them to the list of instruments exempted from the federal securities laws.

## II. EXCEPTION FOR NOTES WITH MATURITY OF LESS THAN NINE MONTHS

■ Wallenbrock's final defense[5] is that the notes are exempt from federal

---

**5.** In view of our determination that the notes are securities, we do not reach the SEC's

argument that the notes are investment contracts and therefore securities under the Se-

regulation because of the Securities Acts' exception for notes with a maturity period of less than nine months. *See* 15 U.S.C. § 77c(a)(3) ("[T]he provisions of this subchapter shall not apply to any of the following classes of securities: (3) Any note ... which has a maturity at the time of issuance of not exceeding nine months...."); 15 U.S.C. § 78c(a)(10) (Securities Exchange Act exception).[6] Although this exception may appear applicable to the Wallenbrock notes, we have held that the exception applies only to commercial paper, defined by the Supreme Court as "short-term, high quality instruments issued to fund current operations and sold only to highly sophisticated investors." *Reves,* 494 U.S. at 70, 110 S.Ct. 945; *R.G. Reynolds,* 952 F.2d at 1131–33. The Wallenbrock notes are not short-term instruments, nor were they sold to highly sophisticated investors. Consequently, the notes do not fall within the Securities Acts' nine-month exception.

**AFFIRMED.**

curities Acts. *See* 15 U.S.C. §§ 77b(a)(1) and 78c(a)(10).

6. The exceptions in the two Acts are construed as coextensive. *See S.E.C. v. R.G. Reynolds Enter., Inc.,* 952 F.2d 1125, 1132 n. 8 (9th Cir.1991).